616 A.2d 686

**COMMONWEALTH of Pennsylvania**

v.

**Andrea M. GERULIS, Appellant.**

Superior Court of Pennsylvania.

Argued Aug. 26, 1992.

Filed Nov. 13, 1992.

Jack W. Connor, Asst. Public Defender, Uniontown, for appellant.

Thaddeus A. Dutkowski, Asst. Dist. Atty., Pittsburgh, for Com.

Before MONTEMURO, KELLY and BROSKY, JJ.

KELLY, Judge.

In this appeal, we decide two issues of first impression: whether the unauthorized use of a voice mailbox contitutes "Unlawful Use of a Computer," within the meaning of 18 Pa.C.S.A. § 3933(a)(1), when the unauthorized user ousts authorized users from the voice mailbox for her sole control; and, whether that conduct is a theft of services, as defined in 18 Pa.C.S.A. § 3926(a)(1). After a bench trial, appellant was convicted of two counts of each crime. We affirm in part, reverse in part and remand for modification of the order of restitution.

## I. FACTS AND PROCEDURAL HISTORY

Appellant was arrested on May 8, 1990, for her alleged infiltration of voice mailbox systems of two organizations, Magee Women's Hospital and Pittsburgh Cellular I Telephone Company. The Commonwealth charged appellant with two counts of unlawful use of computers, 18 Pa.C.S.A. § 3933(a)(1), two counts of theft of services, 18 Pa.C.S.A. § 3926(a)(1), and one count of unlawful use of credit cards, 18 Pa.C.S.A. § 4106(a)(3). After a preliminary hearing, the last charge was dismissed. On May 3, 1991, appellant proceeded to trial. The Commonwealth adduced the following evidence, which the trial court, as fact-finder, accepted.

Gayle Ziccardi, manager of telecommunications at Magee Women's Hospital (Magee Hospital), testified that at least forty of the hospital's voice mailboxes had been taken over by unauthorized users. The authorized users were employees of Magee who left messages for one another and for the benefit of hospital patients and the general public. Cracking the secret password, the unauthorized users would access the system and leave messages for other "phone phreakers,"[1] ousting the intended user. The benefit to the intruders was free message space to leave a list of illegally obtained credit and calling card numbers on the boxes.

Ms. Ziccardi heard the code name "Electra" on one mailbox. The operations of Magee Hospital were disrupted, as Ms. Ziccardi "was required to constantly purge the unauthorized interlopers, re-program the [voice mailboxes] and contact authorized users with regard to the next passwords." Trial Court Opinion of January 31, 1992 (Trial Court Opinion) at 3. Ms. Ziccardi repeated that process for nine months as often as the intruders entered the hospital's system. She could have spent her time conducting her "daily business matters." *Id.* The court concluded that over the nine month period, due to the interruption of forty boxes, Magee Hospital lost $4,300,

---

1. A phone-phreaker is one who illegally markets telephone services. *See generally* Flanagan and McMenamin, *For Whom the Bells Toll,* Forbes, Aug. 3, 1992, at 60–64.

calculated by the hours which Ms. Ziccardi was forced to spend purging the voice mailbox system.

The other corporate target was Pittsburgh Cellular I Telephone Company (Pittsburgh Cellular Phones). Paul Zanotto, as operations manager, was responsible for maintaining Pittsburgh Cellular Phones' voice mailbox system. Most of the authorized users of those boxes were subscribers of cellular phones, who paid a monthly usage fee and a per-minute retrieval charge. Customers of Pittsburgh Cellular Phones complained that their passwords no longer accessed their voice mailboxes. Investigation then led to the discovery that someone had changed their passwords.

During his investigation, Mr. Zanotto identified "Electra" as the name of the woman who infiltrated one of the boxes, number 298–8139. "He heard 'Electra' providing information for other persons in the system and into private branch exchange (P.B.X.) dialing instructions." Trial Court Opinion at 4. The trial court accepted Mr. Zanotto's testimony that Pittsburgh Cellular Phones had lost $2,500 by fixing the mailboxes and appeasing disgruntled customers.

At trial, another prosecution witness, John Bradbury, testified that "Electra" and he were "phone-phreakers." The trial court explained:

> They discussed codes for long distance calls, how to get into VMB [voice mailbox] systems and how to use these codes to get free phone calls using other people's numbers. Bradbury continued as to how he and the [appellant] would trade these numbers in attempts to get free long distance phone service illegally; the term he applied to one who engages in this activity was "phone-phreaker."

Trial Court Opinion at 5. Appellant and Bradbury were able to succeed in the marketing of their illegally obtained information through the use of the voice mailboxes of Magee Hospital and Pittsburgh Cellular Phones.

Posing as a fellow "phone-phreaker," Sergeant John Michalec was able to gain appellant's confidence. Appellant contacted Sergeant Michalec through an undercover voice mailbox at

Magee Hospital. She confided in him that she used Magee's system, and others, as a conduit for furthering the unauthorized dissemination of credit card and telephone card numbers. The sergeant verified that appellant was "Electra" when, pretending to be a customer, he contacted her at her place of business.

At trial, Officer Michalec recounted appellant's post-arrest statement: "Yeah, I know I'm in Cellular I and 647–1666 [Magee Hospital] illegally and, yeah, I use people's telephone credit card numbers, but I'm trying to quit." Trial Transcript, May 3, 1991, at 74. She again admitted that she had accessed the systems of both organizations and that she used the name "Electra." Appellant explained that she did not obtain authorization to use the voice mailboxes because she did not want to pay the fees.

Based upon the preceding evidence, the trial court found appellant guilty of two counts each of unlawful use of a computer, 18 Pa.C.S.A. § 3933(a)(1), and theft of services, 18 Pa.C.S.A. § 3926(a)((1). The court graded the theft of services as third degree felonies, because it found that appellant's criminal enterprise had caused more than $2,000 worth of damage to each organization. The trial court ordered restitution in the amounts of $4,300 to Magee Hospital and $2,510.25 to Pittsburgh Cellular Phone and sentenced appellant to two consecutive terms of probation of five years each. Post-verdict motions were denied, and this timely appeal followed.

Appellant raises the following issues for our review:

I. WHETHER THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN THE GUILTY VERDICTS ON THE TWO (2) COUNTS OF UNLAWFUL USE OF COMPUTERS, 18 Pa.C.S.A. § 3933(a)(1)?

II. WHETHER THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN THE GUILTY VERDICTS ON THE TWO (2) COUNTS OF THEFT OF SERVICES, 18 Pa.C.S.A. § 3926(a)(1)?

III. WHETHER THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN THE GUILTY VERDICTS AS TO THE THEFT OF SERVICES CHARGES, GRAD-

ING SAID OFFENSES AS FELONIES OF THE THIRD DEGREE, AS THERE WAS NO EVIDENCE TO ESTABLISH THAT THE VALUE OF SAID SERVICES ALLEGEDLY RECEIVED EXCEEDED THE AMOUNT OF TWO THOUSAND DOLLARS?

IV. WHETHER THE PART OF THE SENTENCE IMPOSED REQUIRING APPELLANT TO PAY SPECIFIED RESTITUTION TO MAGEE WOM[E]N'S HOSPITAL AND TO PITTSBURGH CELLULAR TELEPHONE COMPANY WAS ILLEGAL AS THE SAME WAS WHOLLY UNSUPPORTED BY EVIDENCE PRODUCED AT TRIAL?

Appellant's Brief at 4.

## II. STANDARD OF REVIEW FOR SUFFICIENCY OF EVIDENCE

■ Our standard of reviewing an assertion of insufficiency of evidence is as follows.

In viewing the evidence, we remain mindful that credibility determinations were a matter solely for the fact finder below. *Commonwealth v. Murray,* 408 Pa.Super. 435, 440–41, 597 A.2d 111, 114 (1991) (*en banc*). On appeal, we must examine the evidence in the light most favorable to the Commonwealth drawing all reasonable inferences therefrom. *Commonwealth v. Bryant,* 524 Pa. 564, 567, 574 A.2d 590, 592 (1990); *Commonwealth v. Ables,* 404 Pa.Super. 169, 173–77, 590 A.2d 334, 336–37 (1991); *Commonwealth v. Rue,* 362 Pa.Super. 470, 476, 524 A.2d 973, 976 (1987); *Commonwealth v. Sanders,* 339 Pa.Super. 373, 378, 489 A.2d 207, 209 (1985); *Commonwealth v. Robinson,* 316 Pa.Super. 152, 155, 462 A.2d 840, 841 (1983); *Commonwealth v. Combs,* 298 Pa.Super. 527, 529, 445 A.2d 113, 114 (1982). If a jury could have reasonably determined from the evidence adduced that all of the necessary elements of the crime were established, then the evidence will be deemed sufficient to support the verdict.

*Commonwealth v. Berkowitz,* 415 Pa.Super. 505, 515, 609 A.2d 1338, 1343 (1992).

■■■■■■■

### III.  UNLAWFUL USE OF COMPUTERS

Appellant first contends that the Commonwealth did not offer sufficient evidence to convict her of unlawful use of computers, 18 Pa.C.S.A. § 3933(a)(1), with regard to both Magee Hospital and Pittsburgh Cellular Phone.  We disagree.

Appellant was charged and convicted under subsection (a)(1) of 18 Pa.C.S.A. § 3933,[2] which provides:

### § 3933.  Unlawful use of computer

(a) **Offense defined.**—A person commits an offense if he:

(1) accesses, alters, damages or destroys any computer, computer system, computer network, computer software, computer program or data base or any part thereof, with the intent to interrupt the normal functioning of an organization or to devise or execute any scheme or artifice to defraud or deceive or control property or services by means of false or fraudulent pretenses, representations or promises.

The relevant definitions are as follows:

"**Access.**"  To intercept, instruct, communicate with, store data in, retrieve data from or otherwise make use of any resources of a computer, computer system, computer network or data base.

"**Computer.**"  An electronic, magnetic, optical, hydraulic, organic or other high speed data processing device or system which performs logic, arithmetic or memory functions and includes all input, output, processing, storage, software or communication facilities which are connected or related to the device in a system or network.

"**Computer network.**"  The interconnection of two or more computers through the usage of satellite, microwave, line or other communication medium.

"**Computer program.**"  An ordered set of instructions or statements and related data that, when automatically exe-

---

**2.**  Appellant was not charged under 18 Pa.C.S.A. § 3933(a)(2), which criminalizes, *inter alia,* the intentional and unauthorized access of computers.

cuted in actual or modified form in a computer system, causes it to perform specified functions.

**"Computer software."** A set of computer programs, procedures and associated documentation concerned with the operation of a computer system.

**"Computer system."** A set of related, connected or unconnected computer equipment, devices and software.

**"Data base."** A representation of information, knowledge, facts, concepts or instructions which are being prepared or processed or have been prepared or processed in a formalized manner and are intended for use in a computer, computer system or computer network, including, but not limited to, computer printouts, magnetic storage media, punched cards or data stored internally in the memory of the computer.

    \*     \*     \*     \*     \*     \*

**"Property."** Includes, but is not limited to, financial instruments, computer software and programs in either machine or human readable form, and anything of value, tangible or intangible.

**"Services."** Includes, but is not limited to, computer time, data processing and storage functions.

18 Pa.C.S.A. § 3933(c). Our research has discovered no Pennsylvania appellate decision interpreting this statute, and the legislative history sheds no further light on its meaning, parameters, or general purpose.

 ■ Despite the lack of previous interpretation, we are not without guidance, as an unambiguous statute is to be given the meaning expressed by its words. *See* 18 Pa.C.S.A. § 105 (provisions of Crimes Code are to "be construed according to the fair import of their terms . . . ."); 1 Pa.C.S.A. § 1921(b) ("When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit."). "While strict construction of penal statutes is required, courts are not required to give words of a criminal statute their narrowest meaning or disregard evident legislative intent." *Commonwealth v. Wooten,* 519 Pa. 45, 53, 545 A.2d 876, 880 (1988). *See also Common-*

*wealth v. Grayson,* 379 Pa.Super. 55, 59, 549 A.2d 593, 595 (1988) ("Words and phrases in a statute are to be construed according to their common meaning and accepted usage."). In this case, we must determine whether appellant accessed a computer (or another protected device) with the requisite intent.

## A. ACCESS

■ The statutory definition of "access" encompasses several acts, including the interception or communication with, the storage of information in, the retrieval of data from, and the use of the resources of a computer or other specified device. 18 Pa.C.S.A. § 3933(c). We find support in the record for the trial court's conclusion that appellant accessed the voice mailboxes herein.

For Magee Hospital, Ms. Ziccardi testified that she heard the voice of Electra on one of the voice mailboxes. Appellant admitted to depositing into and retrieving certain information from Magee Hospital's voice mailboxes. With regard to whether appellant accessed a computer belonging to Pittsburgh Cellular Phones, Mr. Zanotto testified:

> If you're talking specifically of this case, on the mailbox 298–8139, I believe was the number, it was a voice recording from Electra which provided some information for other persons who were into the system, some other numbers provided access codes into PBXs and dialing instructions to get through to them, long distance credit cards, and et cetera.

Trial Transcript, May 3, 1991, at 33. Moreover, appellant's post-arrest admission indicated that she was "in Cellular I . . . illegally." *Id.* at 74.

The uncontroverted trial testimony overwhelmingly establishes that appellant altered the passwords of voice mailboxes, thereby gaining entrance into those systems. Her alteration of passwords was via instruction to and communication with the voice mailboxes. Moreover, her use of the voice mailboxes as her own answering services encompassed the storage and retrieval of data. These actions also fall under the plain

meaning of "use of any resources of a computer." Consequently, we conclude that the trial court was correct in determining that appellant "accessed" voice mailboxes herein. 18 Pa.C.S.A. § 3933(c).

## B. COMPUTER OR RELATED DEVICE

In addition to determining that appellant accessed voice mailboxes, we also conclude that a voice mailbox is a "computer, computer system, computer network, computer software, computer program or data base, or any part thereof," as those terms are defined within the statute. The definitions of these terms are broad. For purposes of this criminal statute, a "computer" is:

> [a]n electronic, magnetic, optical, hydraulic, organic or other high speed data processing device or system which performs logic, arithmetic or memory functions and includes all input, output, processing, storage, software or communication facilities which are connected or related to the device in a system or network.

18 Pa.C.S.A. § 3933(c).

One commentator has explained that even an ordinary telephone system is connected with a computer. "Telecommunications systems have become so tightly merged with computer systems that it is often difficult to know where one starts and the other finishes. The telephone system, for example, is highly computerized and allows computers to communicate across long distances." Stanley S. Arkin, et al., Prevention and Prosecution of Computer and High Technology Crime 7–39 (1990).

At least one court has agreed. In *People v. Johnson,* 148 Misc.2d 103, 560 N.Y.S.2d 238 (N.Y.Crim.Ct.1990), defendant purchased a stolen calling card and used it to telephone someone in Poland. The court upheld the conviction of unauthorized use of computer, and, in so concluding, the court found that the telephone system which defendant employed was a "computer," as defined by statute.

The instrumentality at issue here is not merely a telephone, as defendant asserts, but rather a telephone inextricably linked to a sophisticated computerized communication system. Credit card numbers are central to that system, for they themselves constitute evidence of a coding system designed to prevent system misuse. A prospective caller attempting to use the AT & T system simply could not succeed in placing a non-collect long distance call without the proper "code"—i.e., credit card number—which is necessary to activate the telephone computer.

This telephone system ... does comport with the statutory definition of "computer," that is, the system is "a group of devices which by manipulation of electronic ... impulses ... can automatically perform ... logical, storage or retrieval operations with or on computer data."

*Id.,* 560 N.Y.S.2d at 241.

In the instant case, at trial, Ms. Ziccardi explained the functions of Magee Hospital's voice mailbox system.

Q. Could you tell us—you mentioned voice mailbox system. Could you tell us what a voice mailbox is.

A. A voice mailbox is a computerized electronic message answering system.

Q. Okay. And how is that system different than, say, an answering machine?

A. It's different inasmuch as it's a hard-disk drive of voice communications that you access via a password and through Touch Tone telephones.

Q. Okay. Is there, in a voice mailbox system, is there a magnetic audio tape used?

A. Yes.
Well, it's electronic. It's a hard-disk drive. It's a very large computer system. I can't describe it any other way.

Q. And how does it function? Could you describe for the Court how one would go about using a voice mailbox system.

A. There's a main number you call in to access the voice mail system, and then subscribers are given a mailbox

number. And once you have the subscriber identification, then you program in your password and you can proceed to send messages, record messages.

BY THE COURT:

Q. To who? Who do you send these messages to?

A. In the case of Magee we use it in telephone answering and messaging.

Q. You call somebody at Magee Hospital and it's like an answering service or something like that?

A. That's one aspect of it, yes.

Q. Basically, just so I know what you're talking about.

A. Yes.

THE COURT: All right, thank you, ma'am.

BY [the prosecutor]:

Q. And when these messages are left on the voice mailbox how are they retrieved?

A. They're retrieved by accessing the system number, then your mailbox number and then a password.

&ast; &ast; &ast; &ast; &ast; &ast;

Q. Miss Ziccardi, you said that this system is a hard-disk-drive system?

A. Yes.

Q. And I'm going to summarize this. Are you saying that what happens here is these individuals, these employees are assigned a voice mailbox; is that correct?

A. Yes.

Q. Okay. And they use them for sending messages back and forth between themselves and also for receiving messages?

A. Yes.

Q. Similar to an answering machine?

A. It's a computerized answering system.

Trial Transcript, May 3, 1991, at 14–15, 23.

Similarly, Mr. Zanotto explained the voice mailbox system at his organization, Pittsburgh Cellular Phones.

280

Q. And the voice mailbox system that you have in place at Pittsburgh Cellular, does that work on the same theory as that which Ms. Ziccardi has already testified to?

A. Without knowing her system, I would think yes.

Q. Okay.

A. It's a computer-based system.

Q. How does yours work?

A. The software program has a hard-disk drive and is a digital interface, so to speak, if you're familiar with those types of terms.

Q. And how do you use your voice mailbox system?

A. Our system is sold to subscribers as a feature of the cellular phones. It's also used internally for the same type features that Magee has.

Q. And I assume if you say that your system is sold to subscribers, that you charge them for that?

A. Yes, we charge a per-month usage and also per minute for retrievals.

Q. And the method of actually retrieving a voice mailbox message, is that the same as was described by Ms. Ziccardi?

A. In some cases for a cellular user, it can vary. A cellular user acts as his own voice mail, dials what we call a pseudo NXX. NXX is an exchange, like the NXX in my office is 471, and down here it may be 266 or 261, something like that. From your cellular phone, to access voice mail, you dial 111, and that will not work in the normal phone system. That's internal to our system only.

Q. Okay. And after you access the system what happens?

A. Then you receive your message. You use the pound key on your phone to stop the message and insert the password and then either retrieve, send, whatever you want to do.

*Id.* at 30–31.

■ The trial court found that a "voice mailbox is a computerized hard disk drive electronic message answering system having a digital interface that is accessed, via a password, and

through a touch tone telephone." Trial Court Opinion at 2. The mailbox is created by computer software, and the messages are stored on computer disks. *Id.* The user, usually an employee or subscriber, retrieves his message by entering his personal identification number. *Id.*

Provided with the foregoing testimony, the trial court did not err in finding that appellant accessed a "computer," as the term is defined in 18 Pa.C.S.A. § 3933(c). The evidence established that the voice mailboxes store messages left by callers. Moreover, the (authorized or unauthorized) users of the voice mailbox services have the ability to alter the outgoing messages. Therefore, the voice mailboxes are "electronic . . . or high speed data processing device[s] . . . which perform . . . memory functions." 18 Pa.C.S.A. § 3933(c). As such, the voice mailboxes are "computers." 18 Pa.C.S.A. § 3933(c).

## C. INTENT

Appellant contends that, even assuming she accessed a computer, the Commonwealth failed to establish that she did so "with the intent to interrupt the normal functioning of an organization or to devise or execute any scheme or artifice to defraud or deceive or control property or services by means of false or fraudulent pretenses, representations or promises." 18 Pa.C.S.A. § 3933(a)(1). We cannot agree.

From the foregoing language, it is evident that the intent element in this statute is disjunctive rather than conjunctive. Our Supreme Court has explained:

"Or" in its ordinary usage and meaning clearly and undoubtedly means "or." "Or" can only be construed to mean "and" when to give the word "or" its ordinary meaning would be to produce a result that is absurd or impossible of execution or highly unreasonable or would manifestly change or nullify the intention of the legislative body.

*Garratt v. City of Philadelphia*, 387 Pa. 442, 445, 127 A.2d 738, 740 (1956). When a criminal statute criminalizes two separate actions or intents, the Commonwealth need only prove one. *See Commonwealth v. Bretz*, 289 Pa.Super. 259, 264–65, 433

A.2d 55, 58 (1981) (where criminal statute proscribes maintenance of "any ... slot machine or any device to be used for gambling purposes," the Commonwealth need only prove that the device was a slot machine; it need not also show "actual use in a gambling operation").

Subsection (a)(1) proscribes two separate and distinct intents: *"intent to interrupt the normal functioning of an organization," or,* "intent ... to devise or execute any scheme or artifice to defraud or deceive or control property or services by means of false or fraudulent pretenses, representations or promises." 18 Pa.C.S.A. § 3933(a)(1) (emphasis added). The Commonwealth need prove only one intent. *Commonwealth v. Bretz, supra.*

■■■ Our General Assembly has defined culpable intent as follows.

A person acts intentionally with respect to a material element of an offense when:

(i) if the element involves the nature of his conduct or a result thereof, it is his conscious object to engage in conduct of that nature or to cause such a result.

18 Pa.C.S.A. § 302(b)(1)(i). In its case in chief, the Commonwealth may establish intent through circumstantial evidence. "Because a state of mind by its very nature is subjective, absent a declaration by the actor himself, we can only look to the conduct and the circumstances surrounding it to determine the mental state which occasioned it." *Commonwealth v. O'Searo,* 466 Pa. 224, 238, 352 A.2d 30, 37 (1976). *See also Commonwealth v. Wright,* 289 Pa.Super. 399, 433 A.2d 511 (1981) (due to subjective nature of a person's mind, court must look at surrounding circumstances to determine mental state). A fact finder may conclude that a person "intended the natural and probable consequences of his act." *Commonwealth v. Thomas,* 465 Pa. 442, 447, 350 A.2d 847, 849 (1976). *See also Commonwealth v. Fry,* 341 Pa.Super. 333, 336, 491 A.2d 843, 844–45 (1985) (citing *id.*).

The following evidence is relevant to appellant's "intent to interrupt the normal functioning" of Magee Hospital and

Pittsburgh Cellular Phones. Sergeant John Michalec testified with regard to appellant's statement to him:

[Appellant stated] that she knowingly and intentionally accessed Magee Hospital systems, that she knew she was in there without their knowledge, and she maintained several voice mailbox systems on the same. When I asked her how long she had been in Magee, she stated she had been in there two years.

Trial Transcript, May 3, 1991, at 76. Ms. Ziccardi testified that several voice mailboxes, including the one on which Ms. Ziccardi recognized appellant's voice, were disrupted. Legitimate callers would dial Magee Hospital, and, instead of hearing a message from a Magee employee, they would "get a list of Master Card numbers and AT & T and Bell Telephone credit cards with expiration dates." Trial Transcript, May 3, 1991, at 17. "[T]hose mailboxes were rendered useless for that period of time." *Id.* at 20.

Appellant also linked into the voice mailbox used by the marketing department of Pittsburgh Cellular Phones. There was evidence that, due to appellant's intrusion, the marketing department could not use box 298–8139, and the authorized users had to eventually create a new box. *Id.* at 40–41. Appellant had gained access to Pittsburgh Cellular Phones for "personal use" and remained there approximately one year. *Id.* at 84.

The above evidence establishes that appellant used the voice mailboxes, without authority, as a tool in her scheme of marketing unlawfully obtained information. The trial court could have reasonably concluded that appellant knew that she was unauthorized to use those voice mailboxes, but wanted to avoid payment for the raw materials of her enterprise. Appellant not only gained access but insured her domain on the boxes, if only temporarily, by changing the access codes. A necessary step for her successful routing of contraband information was the exclusive control and use of the voice mailboxes. The logical and probable consequence of appellant's unauthorized domain over the voice mailboxes was that authorized users could not simultaneously enjoy using the boxes. Ac-

cordingly, the trial court could have inferred that, by preventing authorized users from using their message systems, appellant foresaw that she would interrupt the normal functioning of the two organizations. These foreseeable consequences came to fruition as appellant's unauthorized access of the voice mailboxes actually disrupted both organizations.

The foregoing evidence sufficiently established that appellant acted "with the intent to interrupt the normal functioning of [two] organization[s]." 18 Pa.C.S.A. § 3933(a)(1).[3] Therefore, appellant's sufficiency challenge necessarily fails.

## IV. THEFT OF SERVICES

The trial court also found appellant guilty of two counts of theft of services, 18 Pa.C.S.A. § 3926(a)(1). Appellant argues that she did not obtain services which the victim organizations provided for compensation only. Consequently, according to appellant, the Commonwealth did not produce sufficient evidence to prove her guilty of theft of services. We are constrained to agree.

Appellant was charged under the following subsection:

§ 3926. **Theft of services**

(a) **Acquisition of services.—**

(1) A person is guilty of theft if he intentionally obtains services for himself or for another *which he knows are available only for compensation,* by deception or threat, by altering or tampering with the public utility meter or measuring device by which such services are delivered or by causing or permitting such altering or tampering, by making or maintaining any unauthorized connection, whether physically, electrically or inductively, to a distribution or transmission line, by attaching or maintaining the attachment of any unauthorized device to any cable, wire or other

---

**3.** Because the Commonwealth need only establish one criminal intent, discussion of the second description of intent, *i.e.,* "intent ... to devise or execute any scheme or artifice to defraud or deceive or control property or services by means of false or fraudulent pretenses, representations, or promises," 18 Pa.C.S.A. § 3933(a)(1), is unnecessary for the disposition of this appeal. Accordingly, we leave discussion of that *mens rea* for another day.

component of an electric, telephone or cable television system or to a television receiving set connected to a cable television system, by making or maintaining any unauthorized modification or alteration to any device installed by a cable television system, or by false token or other trick or artifice to *avoid payment for the service.*

18 Pa.C.S.A. § 3926(a)(1) (emphasis added).

As we have previously stated, a criminal statute is to be accorded the fair import of its terms, 18 Pa.C.S.A. § 105, and its clear and unambiguous terms must be effectuated. 1 Pa.C.S.A. § 1921(b); *Commonwealth v. Wooten, supra; Commonwealth v. Grayson, supra.* The fair import of § 3926(a)(1) is to proscribe the theft of services which are provided to consumers for payment. The subsection lists, as examples of such services, electric, telephone or cable television services. *Id.* Moreover, subsection (a)(2) further indicates that the intent was to label as a "theft" the unauthorized taking of services which results in the provider losing not the services alone, but a payment for the services provided:

As used in this section, the word "service" includes, but is not limited to, labor, professional service, transportation service, the supplying of hotel accommodations, restaurant services, entertainment, cable television service, the supplying of equipment for use, and the supplying of commodities of a public utility nature such as gas, electricity, steam and water, and telephone service. The term "unauthorized" means that payment of full compensation for service has been avoided, or has been sought to be avoided, without the consent of the supplier of the service.

18 Pa.C.S.A. § 3926(a)(2). Consistent with the language of § 3926(a)(1), a prerequisite underlying the crime is that the defendant intentionally obtain services which are available only for compensation. Consequently, the mere intent to obtain free services is not a crime if the services are not available solely for a fee.

In the instant case, Ms. Ziccardi, the manager of telecommunications at Magee Hospital, never testified that the hospital's voice mailboxes were available to outside users for pay-

ment. That system was for the convenience of employees of Magee Hospital and outside callers seeking information. Outsiders were not expected to pay a price to leave a message, nor could they pay for the right to use the voice mailbox system for themselves.

While Pittsburgh Cellular Phones provided voice mailbox services to its customers for a fee, we must discern whether appellant accessed a box which was available solely for compensation. On cross-examination, Mr. Zanotto explained the purpose of the box which appellant accessed.

Q. Mr. Zanotto, I would like to ask you a couple questions about the mailbox in question. It's 298–8139?

A. That's correct.

Q. Now, how would you describe this box? Is it one that was specifically opened up for some purpose or was it just one of the mailboxes?

A. Actually this box was opened up for our marketing department during our promotion.

Q. It was a demonstration box for you?

A. It was opened up for our marketing department.

Q. And what did the marketing department do with the box?

A. They were running a promotion on the voice mailbox, and they were providing the number so people could call in and receive information on it.

Q. So what was inside the mailbox? What was supposed to be inside the mailbox?

A. I never heard our recording. I couldn't answer that.

Q. You're saying your marketing department itself used the voice mailbox?

A. Yes.

Trial Transcript, May 3, 1991, at 37–38.

This exchange indicates that even at Pittsburgh Cellular Phones, appellant did not access a voice mailbox which was available only for compensation. The Commonwealth failed to adduce any evidence, in support of either of the two counts, which can sustain a finding that appellant obtained services

which are "available only for compensation." 18 Pa.C.S.A. § 3926(a)(1).[4] Accordingly, we must vacate appellant's convictions for these two counts.[5]

## V. RESTITUTION

Appellant's final argument is that the order of restitution was illegal because the evidence was insufficient to establish that appellant caused the full extent of monetary damages suffered by the victim organizations. We find that the trial court erred in affixing restitution in the amounts of $4,300 with regard to Magee Hospital and $2,510.25 with regard to Pittsburgh Cellular Phones.

4. However, our decision in this case should not be construed to mean that the unauthorized use of a computer can never also constitute theft of services. We find that our legislature has specifically mandated that in order to convict under 18 Pa.C.S.A. § 3926(a)(1), the Commonwealth need establish that the obtained service was *actually* available only for compensation.

5. Because we reverse appellant's convictions for theft of services, we need not address the propriety of grading them as third degree felonies.

That appellant is guilty of unlawful use of computers, but not guilty of theft of services is not incongruous. The result may have been different had the theft of services statute included a definition of services allowing for those which are not available only for a fee. See e.g. 18 Pa.C.S.A. § 3933(c) (for unlawful use of computer statute, "services" "[i]ncludes, but is not limited to, computer time, data processing and storage functions").

Sister jurisdictions have similarly held that the unauthorized use of a computer is not necessarily a "theft." See State v. McGraw, 480 N.E.2d 552 (Ind.1985) (where theft statute sought to proscribe the deprivation of property or use, defendant was not guilty because, although he used employer's computer without authority, his activity did not deprive employer of any use or value); People v. Weg, 113 Misc.2d 1017, 450 N.Y.S.2d 957 (N.Y.Crim.Ct.1982) (where computer was used as part of organizational resource and not "for profit in trade or commerce," defendant did not violate theft of services statute by using his employer's computer, without permission, for his own personal gain); cf. Lund v. Commonwealth, 217 Va. 688, 232 S.E.2d 745 (1977) (time and service which student impermissibly obtained from university computer were not "goods and chattels" for purposes of grand larceny statute). However, in Virginia, since 1978, "computer time or services or data processing services or information or data stored in connection therewith" is "property" for purposes of larceny, embezzlement, or false pretenses. Va.Code § 18.2–98.1. Accordingly, theft of a computer printout constitutes petit larceny, under the broadened definition of

■ A court is authorized to incorporate restitution as part of a sentence. The statutory authorization provides:

### Restitution for injuries to person or property

(a) **General rule.**—Upon conviction for any crime wherein property has been stolen, converted or otherwise unlawfully obtained, or its value substantially decreased as a direct result of the crime, or wherein the victim suffered personal injury directly resulting from the crime, the offender may be sentenced to make restitution in addition to the punishment prescribed therefor.

18 Pa.C.S.A. § 1106(a). Whether to order restitution at all is within the discretion of the trial court. *Commonwealth v. McLaughlin,* 393 Pa.Super. 277, 292, 574 A.2d 610, 617 (1990), *allocatur denied,* 527 Pa. 616, 590 A.2d 756 (1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 320, 116 L.Ed.2d 261 (1991).

Ordering a defendant to pay restitution serves two purposes. While the payments may compensate the victim, the sentence is also meant to rehabilitate the defendant by instilling in her mind *that it is her responsibility* to compensate the victim. *Commonwealth v. Boyles,* 407 Pa.Super. 343, 359, 595 A.2d 1180, 1188 (1991); *Commonwealth v. Balisteri,* 329 Pa.Super. 148, 156, 478 A.2d 5, 9 (1984).

■ In computing the amount of restitution, the sentencing court "[s]hall consider the extent of injury suffered by the victim and such other matters as it deems appropriate." 18 Pa.C.S.A. § 1106(c)(1). To determine the correct amount of restitution, a "but-for" test is used—damages which occur as a direct result of the crime are those which should not have occurred but for the defendant's criminal conduct. *Commonwealth v. Penrod,* 396 Pa.Super. 221, 229 n. 1, 578 A.2d 486, 490 n. 1 (1990); *see also Commonwealth v. Harner,* 402 Pa.Super. 472, 587 A.2d 347 (1991), *allocatur granted,* 529 Pa. 631, 600 A.2d 951 (1991). The sentencing court cannot require payment in excess of the damage which defendant caused. *Commonwealth v. Boyles, supra,* 407 Pa.Super. at 359, 595

"property." *Evans v. Commonwealth,* 226 Va. 292, 308 S.E.2d 126 (1983).

A.2d at 1188; *Commonwealth v. Balisteri, supra,* 329 Pa.Super. at 156, 478 A.2d at 9. "An award of restitution should not be speculative or excessive." *Commonwealth v. McLaughlin, supra,* 393 Pa.Super. at 292, 574 A.2d at 617.

*Commonwealth v. Reed,* 374 Pa.Super. 510, 543 A.2d 587 (1988), is illustrative of the extent to which a defendant can be made to reimburse a victim. In *Reed,* two stores were burglarized: an auto parts store was deprived of $6,205.71 worth of merchandise, while a marine-supplies retailer lost $5,796.96 worth of goods. The defendant therein was not implicated with burglarizing either store. However, a jury found the defendant guilty of receiving stolen property: $118.10 worth of goods from the auto parts store and $280.00 worth of merchandise from the marine-supplies retailer. The trial court sentenced the defendant to jail time and to pay restitution based upon the total losses sustained by the two merchants.

This Court vacated the sentence of restitution, reasoning as follows.

Because restitution is a sentence, the amount ordered must be supported by the record; it may not be speculative or excessive. *Commonwealth v. Balisteri,* 329 Pa.Super. 148, 156, 478 A.2d 5, 9 (1984). In a case of theft by receiving stolen property, a reviewing court will not countenance a sentence provision which requires restitution "for property which the Commonwealth has not proven was either stolen or received by the [defendant]." *Commonwealth v. McFarland,* 452 Pa. 435, 441, 308 A.2d 592, 595 (1973).

In the instant case, Reed had been charged with and convicted of theft by receiving stolen property having a combined value of not more than $480.00. However, he was ordered to make restitution in the total amount of $12,-002.67. This was improper. Although the total amount was equal to estimated losses sustained in the burglaries occurring at M & A Distributors and B & B Marine, there was no evidence to show a causal connection between the total losses sustained and Reed's role in receiving some of the

property stolen. The evidence showed that the loss caused by Reed's conduct did not exceed $480.00.

*Id.* at 514, 543 A.2d at 589 (footnote omitted).

Guided by *Commonwealth v. Reed, supra,* we must determine whether the restitution orders corresponded with the amount of damage that appellant caused Magee Hospital and Pittsburgh Cellular Phones. At trial, Ms. Ziccardi testified as follows.

Q. Okay. And all these departments, did they have individualized boxes?

A. Yes.

Q. How many boxes are we talking about?

A. In those three departments?

Q. Um-hum.

A. Thirty.

Q. Okay. And as far as my client is concerned, did you determine or could you determine how many boxes she was using or if she was using any boxes?

A. From all indications, there was one that was 4461, which was the director of accounting, was used by Electra.

Q. Is that the only box?

A. To my knowledge. I don't know which other boxes were assigned to who[m] or who was using them.

Q. So we're only talking about one box, 4461?

A. In the case of Magee, that's the only one I could attest to.

Q. And that only dealt with the accounting department, not human resources, not the educational department?

A. Like I said, there were female voices on it. I don't know who that voice was.

Trial Transcript, May 3, 1991, at 26–27. Also adduced at trial is appellant's admission that she had been in Magee Hospital's voice mailbox system for approximately two years. *Id.* at 76. In terms of identifying *how many* voice mailboxes appellant infiltrated, Ms. Ziccardi was able to identify appellant's voice on only one voice mailbox. Ms. Ziccardi admittedly had no

knowledge as to whether appellant accessed more than that one box. *Id.* at 27.

The testimony with regard to Pittsburgh Cellular Phones established appellant's protracted presence in no more than two voice mailboxes. *See id.* at 33 (Mr. Zanotto testifying that appellant was in one box, 298–8139); *id.* at 84 (appellant testifying that she had gained access to two voice mailboxes at Pittsburgh Cellular Phones). Nonetheless, Mr. Zanotto testified that nearly one hundred voice mailboxes required reprogramming due to unauthorized interference. *Id.* at 35.[6]

**6.** The discrepancy between the organizations' damages and the proven extent of appellant's interference with the voice mailboxes is explained, at least in part, by the activity of another Pittsburgh phone-phreaker. The trial transcript reveals that John Bradbury, a minor, also had accessed, without authority, voice mailboxes at Magee Hospital and Pittsburgh Cellular Phones.

Q. Okay, John, could you tell us how old you are.
A. Sixteen.
Q. And, John, if I could bring your attention back to the time between the beginning of September of 1989 through May of 1990, do you recall that time period?
A. Yes.
Q. Do you recall obtaining access to voice mailboxes during that time period?
A. Yes.
Q. How would you obtain access to these boxes?
A. We called the main system up.
THE COURT: Speak up a little bit, young man.
A. (Continued) You call the main system up and the main call-up number, and you try to find the flaws in it. See, like if sometimes like she said if the password was the same as the box number, or on the Cellular I the password was always 1234 sometimes, and you would be able to get into the box, just rearrange it and put your own message and change the password and stuff.
BY [the prosecutor]:
Q. During that time period did you happen to have any contact with either Andrea Gerulis or an individual named Electra?
A. Yes.
Q. And could you describe for us what contact you had with this individual.
A. At first I started leaving messages on her 4461 box, the Magee–Women's Hospital MB system. And then we started talking over the phone personally to each other about codes for long-distance calls and other VMB systems, voice mailbox systems, to try to get into other mailboxes on other systems.
Q. You said that you started to talk on the phone. How would you contact this person? Who was it that you were contacting?

A. Andrea Gerulis, Electra. I would call her up, at first it was over the VMB systems, and then I got her phone number, and we would call each other on the phone, regular phone lines.

Q. Okay. And you say you spoke about codes. What do you mean when you say you spoke about codes? What sort of codes was it that you spoke about?

A. Long-distance calling numbers, codes that you could use to get free phone calls to long-distance phone calls using other people's numbers.

Q. And also you said other VMBs or voice mailboxes? Did you talk about their numbers?

A. Yes. We would help each other. I mean, we would tell each other different numbers to try, different call-up numbers and try to figure out how to get into them.

Q. And was this information also transferred using the voice mailbox system?

A. Yes, sometimes.

Q. And over what period of time was this used?

A. The voice mailbox system?

Q. Yes.

A. Well, I got involved with calling her probably around late summer of '89, I think it was, yes, late summer of '89 through, I would say, March, yes, I think March of '90, when I got in trouble.

Q. And in the course of speaking with Ms. Gerulis, did she indicate to you whether or not she was the proper owner or operator of that voice mailbox?

A. Well, we both kind of knew that they were just hacked into. I mean, we never really discussed it because it was obvious. I mean, hackers talk to each other, phreakers talk to each other, and if you're a kid, like, you pretty much know that it's not really paid for and it's just your phreak box and stuff.

* * * * * *

BY THE COURT:

Q. Let me ask you, you said you did all this so you could make long-distance phone calls; is that the purpose of it?

A. Yes.

Q. Who did you call?

A. It was kind of like a big cycle. People would get the long-distance calling cards to call to other hackers and phreakers, and then you would trade more numbers.

Q. Call other phreakers?

A. Yes, pretty much.

Q. This was sort of just like for fun or something?

A. Yes.

Q. So you didn't make anything out of this?

A. No.

Q. You just got into all these mailboxes and telephone numbers just because you knew how to do it; right?

A. Yes, kind of like a game, sort of.

THE COURT: Okay, I vaguely understand now.

BY [the prosecutor]:

■  While there is ample evidence that both Magee Hospital and Pittsburgh Cellular Phones were compelled to expend substantial resources to maintain their voice mailbox systems, the evidence does not establish that appellant caused all of the losses. The Commonwealth proved that appellant accessed only one of the thirty Magee Hospital voice mailboxes which were interrupted *by someone*. Appellant is not responsible for more than 1/30 of Magee's damages. Therefore, any restitution order greater than $143.33 (1/30 × $4,300) is based upon insufficient evidence. Likewise, the Commonwealth proved that appellant unlawfully accessed two voice mailboxes at Pittsburgh Cellular Phones, while that organization suffered interruption of one hundred voice mailboxes. An appropriate restitution order would be no greater than $50.21, which is two percent of Pittsburgh Cellular Phones' damages due to interference with one hundred voice mailboxes.[7] Accordingly, we vacate the restitution orders and remand for modification consistent with this opinion.[8]  *See*

Note 6—Continued
Q.  The long-distance calls that you made though did you ever pay for any of them?
A.  No.
Trial Transcript, May 3, 1991, at 43–46; 53–54.

7.  We reject the Commonwealth's argument that appellant is responsible for the wrongful acts of John Bradbury pursuant a conspiracy theory. While we recognize that a defendant is liable for the acts of his co-conspirators, such liability only arises after the defendant is indicted with and proven guilty of conspiracy. *See Commonwealth v. Petrillo*, 338 Pa. 65, 78, 12 A.2d 317, 324 (1940) (one who is not indicted with conspiracy is not a co-conspirator). In this case, appellant was neither charged with nor convicted of conspiracy to commit a crime. Therefore, we cannot apply conspiracy principles with regard to appellant's sentence.

8.  We are not persuaded by appellant's contention that the organizations suffered no actual loss because they would have paid their employees the same salary for performing ordinary and customary duties or for fixing altered voice mailboxes. The organizations are entitled to concentrate the efforts of their employees towards the fulfillment of organizational goals. By routing their employees' services towards making the voice mailboxes again accessible to authorized users, the organizations suffered injuries for purposes of 18 Pa.C.S.A. § 1106(c)(1). *Cf. Commonwealth v. O'Kicki*, 408 Pa.Super. 518, 549, 597 A.2d 152, 167–68 (1991) (Commonwealth, as employer, was a victim under 18 Pa. C.S.A. § 1106, because it paid money to an employee who did not perform duties).

*Commonwealth v. Reed,* 374 Pa.Super. 510, 543 A.2d 587 (1988).

## CONCLUSION

Appellant's convictions of unlawful use of computers were based upon sufficient evidence. Accordingly, we affirm appellant's convictions as to those crimes. However, the Commonwealth adduced insufficient evidence to prove that appellant was guilty of two counts of theft of services. Therefore, the theft of services convictions are reversed and appellant is discharged as to those two counts.

The order of restitution contained in the sentences imposed is vacated. The order is remanded for modification in accordance with the foregoing opinion. Jurisdiction of this Court is relinquished.