**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Harry Charles PAPPAS, Appellant.**

Superior Court of Pennsylvania.

Argued Dec. 10, 2003.

Filed Feb. 12, 2004.

Reargument Denied April 21, 2004.

Matthew R. Raymond, Harrisburg, for appellant.

BEFORE: KLEIN, BENDER, and OLSZEWSKI, JJ.

OPINION BY OLSZEWSKI, J.:

¶ 1 Appellant Harry Pappas was convicted on numerous counts of theft by deception, attempted theft by deception, and tampering with public records in the Court of Common Pleas, Adams County. Appellant appeals his convictions; and we affirm in part, reverse in part, and remand for further proceedings.

¶ 2 Appellant owns Krystal Cadillac Oldsmobile GMC–Truck, Inc., a car dealership. Appellant, through Krystal Cadillac, bought thirty-three used cars. Appellant then repaired these cars before placing the cars in his lot for sale to the public. The level of repair the cars required appears to be in dispute. Regardless of the state of the cars, it is undisputed that the titles to these cars did not contain any notation that the cars were either "salvaged vehicles" or "reconstructed vehicles."

¶ 3 The crux of the case against appellant is that appellant falsely led his customers to believe that the cars were in excellent condition and were not extensively repaired prior to sale. The trial court stated that:

Each and every buyer except one testified that defendant misled them about the status and condition of the vehicle sold. Purchasers were told that the car was a loaner, had been used by a family member, was a good car, a nice car and was either covered by warranty or probably covered by warranty. The automobiles were painted and no repairs were apparent. Stickers indicated that vehicles featured airbags when some did not. Defendant...told the buyer of a Ford F–150 truck that the engine was probably under warranty, but that he hadn't

had time to walk across the street to a Ford dealer to find out. In fact, the truck had been taken to a dealership for repair and was informed that repairs were not covered by warranty.

Trial Court Opinion, 12/13/02, at 5–6. Because of appellant's representations, his customers purchased some of these vehicles without knowledge of the extent of the damage to the cars.

¶ 4 Appellant makes four arguments on appeal: (1) that there was insufficient evidence to find him guilty beyond a reasonable doubt; (2) that the trial court improperly imposed restitution; (3) that his counsel was ineffective for failing to reraise a motion for change of venue as a result of extensive pretrial publicity; and (4) that the trial court judge abused his discretion when he did not recuse himself from the case. Argument (1) Is covered in Points I through IV of appellant's brief, argument (2) is covered in Point V, argument (3) is covered in Point VI, and argument (4) is covered in Point VII.

¶ 5 First, we note that the Commonwealth did not file a brief on appeal, but has submitted a statement, one sentence in length, stating that it adopts the opinion of the court dated August 21, 2002. Since the four-page opinion only describes the details of appellant's sentence, the Commonwealth's "brief" is nothing more than a mere statement that the trial court was correct in its judgments.

¶ 6 An appellee is required to file a brief that at minimum must contain "a summary of argument and the complete argument for appellee." Pa.R.A.P. 2112. When an appellee does not file a brief, he not only denies himself the opportunity to fully assert his interests, but he denies himself the opportunity to challenge the appellant's assertions. We find this practice unacceptable. *See Berks County Intermediate Unit v. Workmen's Compensation Appeal Board,* 158 Pa.Cmwlth. 305, 631 A.2d 801, 804 n. 4 (1993) (a "brief that contains a one sentence summary ... and a three paragraph argument will not generally serve to fully represent an appellee's interests"); *Commonwealth v. Robinson,* 269 Pa.Super. 398, 410 A.2d 316, 318 (1979) ("we cannot continue to accept under any circumstances" the failure of the Commonwealth to file a brief), *rev'd on other grounds* 498 Pa. 379, 446 A.2d 895 (1982).

¶ 7 Because the Commonwealth has failed to file a brief, we must accept as undisputed the statement of questions involved and the statement of the case as presented by appellant, and we look to the opinion of the trial court and the record to determine the validity of appellant's claims. Pa.R.A.P. 2112; *Robinson,* 410 A.2d at 318; *Ware v. McKnight,* 368 Pa.Super. 502, 534 A.2d 771, 775 (1987) (Tamilia, J., dissenting).

## SUFFICIENCY OF THE EVIDENCE

¶ 8 Appellant first challenges the sufficiency of the evidence. The standard of review for sufficiency of the evidence claims is well settled.

The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no

probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proof or proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all the evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Lehman*, 820 A.2d 766, 772 (Pa.Super.2003) (citations omitted).

¶ 9 In reviewing the evidence in the light most favorable to the Commonwealth, we find that there was sufficient evidence to support convictions for all charges except for the charges of theft by deception on vehicles 24 and 25, attempted theft by deception on vehicles 7 and 8, and tampering with public records on vehicle 17.

¶ 10 Appellant first argues (in Point I) that the cars were neither "salvaged vehicles" nor "reconstructed vehicles," and therefore he was not required to disclose the repair history or make any notation on the certificate of title. A reconstructed vehicle is statutorily defined as a vehicle "for which a certificate of salvage was issued and is thereafter restored to operating condition." 75 Pa.C.S.A. § 102; 67 Pa.Code § 19.2(i). Since a certificate of salvage was never issued for any of the thirty-three vehicles at issue, none of the cars can be considered reconstructed vehicles under the above definition.

¶ 11 The Pennsylvania Administrative Code, however, has expanded upon the statutory definition of a reconstructed vehicle. Under the code, a reconstructed vehicle is also a vehicle that: (1) "has been materially altered by the removal, addition or substitution of essential parts derived from various other makes or models;" and (2) "has [been] determined that the vehicle is readily recognizable as a vehicle of a generally recognized make or model" by the Department of Transportation. 67 Pa. Code 19.2(ii). While there is some evidence that the cars have been materially altered, there is no evidence that the Pennsylvania Department of Transportation has made any determination as to whether these cars are "of a generally recognized make or model." Therefore, the cars are not reconstructed vehicles under the additional code definition.

¶ 12 A salvaged vehicle is defined as a "vehicle which is inoperable or unable to meet the vehicle and equipment and inspection standards ... to the extent that the cost of repairs would exceed the value of the repaired vehicle." 75 Pa.C.S.A. 102. Appellant argues that this definition cannot be satisfied because of a specific jury finding that the value of the vehicles at issue did not diminish as a result of the repairs.

¶ 13 We are unsure as to the exact meaning of the jury's specific finding as it relates to this definition. Also, we are unsure as to whether the vehicles were "inoperable or unable to meet the vehicle and equipment and inspection standards" when they were purchased from Enterprise Leasing Company or put up for sale by appellant.

¶ 14 Assuming that the vehicles were not salvaged vehicles as defined by statute, there was sufficient evidence to prove the various elements of the crimes. The sole fact that the cars were or were not salvaged or reconstructed vehicles has little bearing on the crimes of theft by deception, especially considering the other evidence presented by the Commonwealth in this case.

■ ¶ 15 Appellant contends (in Point II(A)-(C)) that there was insufficient evidence to support his convictions for theft by deception. A person commits the crime of theft by deception when "he intentionally obtains or withholds property of another by deception." 18 Pa.C.S.A. § 3922(a). Deception is defined as intentionally: (1) creating or reinforcing a false impression; (2) preventing "another from acquiring information which would affect his judgment of a transaction;" or (3) failing "to correct a false impression which the deceiver previously created or reinforced." 18 Pa. C.S.A. § 3922(a)(1)-(3). *See also Commonwealth v. Fisher*, 452 Pa.Super. 564, 682 A.2d 811, 813 (1996). "[T]he Commonwealth must establish not only the presence of a false impression, but the reliance upon that impression by the victim." *Commonwealth v. Imes*, 424 Pa.Super. 633, 623 A.2d 859, 862 (1993).

■ ¶ 16 First, we note that all the purchasers stated during trial that they would not have purchased the vehicles had they known the history of the vehicles. Therefore, we believe that the reliance element was satisfied by sufficient evidence.

¶ 17 The jury found appellant guilty of theft by deception in regards to ten vehicles (numbers 14, 15, 17, 24, 25, 26, 29, 30, 31, and 32). We will examine the evidence as it pertains to each of these vehicles.

■ ¶ 18 Vehicle number 14 was a 1997 Cadillac Deville. Kenneth Gregory testified that he repaired the undercoating underneath the driver's seat. He also noted that a crack in the transmission existed at the time he inspected the vehicle. This crack was later repaired by a JB weld. While there was no direct testimony that Mr. Gregory personally repaired the crack, he testified that a JB weld is not the correct way to fix a crack in the transmission. He also testified that he discussed the impropriety of the JB weld with Jeffrey Vincent (another Krystal employee) while appellant was present. The purchaser, Fred Whalen, testified that he asked about prior damage to the vehicle and appellant stated that there was no damage. Appellant's misrepresentations about prior damage to vehicle 14 are sufficient evidence to affirm the conviction for theft by deception.

■ ¶ 19 Vehicle number 15 was a 1996 Chevrolet Cavalier. Appellant sold this vehicle to Lloyd Barnett on June 24, 1997.[1] Appellant told Mr. Barnett that the vehicle was in good condition, was not damaged, and had never been in a wreck. Prior to the sale to Mr. Barnett, appellant took the vehicle to Zentz Chevrolet for service.[2] Lindsey Riley, Zentz's service manager, informed Appellant that the car

> had had major front-end collision damage. The radiator had been replaced … [and that] there would be a charge for these repairs because it was a nonwarranty related item due to collision …

N.T., 5/23/02, at 427–28. Therefore, prior to the sale of vehicle number 15, appellant knew the prior history of the car, withheld the information from Mr. Barnett, and provided Mr. Barnett with false information regarding the condition and history of the car. Appellant's misrepresentations about prior damage to vehicle 15 are sufficient evidence to affirm the conviction for theft by deception.

---

1. Mr. Barnett testified that he purchased the car on April 28, 1997. The record indicates that title was transferred from appellant to Mr. Barnett on June 24, 1997, and was later sold by Mr. Barnett to Kate Kissling on October 3, 1997.

2. Lindsey Riley testified that appellant brought the car to Zentz on June 4, 1997.

¶ 20 Vehicle number 17 was a 1996 Dodge Neon. Mr. Gregory testified that the car had been put together (*i.e.*, reconstructed or rebuilt) by another body shop from different sections of the bodies of two distinct vehicles and that vehicle number 17 needed "to go back on the frame machine and taken back apart." N.T., 5/22/02, at 324–26. Mr. Gregory stated that the "car should not be on the road. It needed to be reconstructed again." N.T., 5/22/02, at 327. While Bruce Miller, who purchased the vehicle from appellant, did not ask whether the car had been in any accidents, appellant *did tell Mr. Miller that the car "was just a loaner car and everything else was fine on it."* N.T., 5/22/02, at 328. Appellant's misrepresentations about prior damage to vehicle 17 are sufficient evidence to affirm the conviction for theft by deception.

¶ 21 Vehicle number 24 was a 1996 Chevrolet Beretta, vehicle number 25 was a 1997 Pontiac Grand Am, and vehicle number 26 was a 1995 Oldsmobile Silhouette. These vehicles were purchased by Red Rose Buick. Appellant told Robert Hamilton, the used car manager at Red Rose, that these cars were "nice cars" and that they had a "clean value which would mean a very nice car with no damage."[3] N.T., 5/22/03, at 385. Robert Wesoloskie testified that vehicles 24 and 25 were damaged. There is no evidence on the record, however, to indicate the kind or extent of the damage, when the damage occurred, or what inflicted the damage. Therefore, there is insufficient evidence to conclude that appellant misrepresented the condition of vehicles 24 and 25.

¶ 22 Vehicle 26 is another matter. Mr. Gregory testified that he repaired vehicle 26. He fixed the radiator support, the fenders, the hood, "and everything more or less from your radiator forward." N.T., 5/22/02, at 392. The extensive damage prior to vehicle 26's repair most likely did not warrant a "clean" rating. At best, vehicle 26 was "average," at worst, it was "rough." Appellant represented to Mr. Hamilton that the vehicles (24, 25, and 26) had a "value of clean and a[n] average trade-in value". N.T., 5/22/02, at 385. The jury could have reasonably concluded that this evidence was insufficient to establish the crime of theft by deception. The jury, however, concluded that appellant's misrepresentations in regards to vehicle 26 amounted to theft by deception. This is a reasonable interpretation of the facts. Therefore, viewing the evidence in the light most favorable to the Commonwealth, we must affirm the conviction of theft by deception as it relates to vehicle 26.

¶ 23 Vehicle 29 was a 1996 Ford Mustang, vehicle 30 was a 1997 Ford F–150 Truck, vehicle 31 was a 1996 Ford Taurus, and vehicle 32 was a 1997 Ford Escort. These four vehicles were sold to Dean Patterson Chevrolet through Patterson's new car sales manager, Joseph McDonald. Mr. McDonald testified that appellant represented to him that these cars were in good condition: that they were an "eight" on a scale of one to ten. Appellant apparently disclosed that vehicle 30 had a bad engine. This disclosure, however, was the only disclosure of damage to any of the vehicles, other than "scratches and dings on the bumper only." N.T., 5/21/02, at

---

**3.** Robert Conley later established that there are four categories of used cars: rough, average, clean, and extra clean. An extra clean car is a car "that has low mileage, no paint work, and it's a very very stand-out car. . . . It's not wrecked. It's not been painted."

N.T., 5/23/02, at 433. A wrecked vehicle diminishes in value to the "average" category, while the rough category indicates that there is something wrong with the vehicle. Appellant represented the vehicle as being "clean."

162, 165, 167. Dan Brennan, Dean Patterson's used car manager, testified that the vehicles had, in fact, been wrecked. Also, the documentary evidence establishes that appellant knew of the extensive damage to the vehicles at the time he purchased them from Enterprise Leasing Company because Enterprise provided damage estimates to appellant. Mr. McDonald asked appellant about the vehicles' history, such as prior accidents; however the record does not affirmatively indicate appellant's answer to this question. The jury could reasonably infer that appellant answered the question and that the answer indicated no prior accidents because Mr. McDonald testified that he would not have purchased the vehicles had he known about the prior accidents. Therefore, there was sufficient evidence for the jury to find that appellant misled Mr. McDonald, and that these misrepresentations amounted to theft by deception.

¶ 24 Appellant was also found guilty of attempted theft by deception in regard to five vehicles (numbers 1, 4, 7, 8, and 9). A person is guilty of an attempt if "with intent to commit a specific crime, he does any act which constitutes a substantial step toward the commission of that crime." 18 Pa.C.S.A. § 901(a). After a careful examination of the evidence as it pertains to each of these vehicles, we find that there was sufficient evidence to support guilty findings on the attempt charges regarding vehicles 1, 4, and 9, but not regarding vehicles 7 and 8.

¶ 25 Vehicle 1 was a 1997 Ford Contour. Mr. Gregory testified that he was unable to repair the air bag system and that he "took ... a pair of pliers ...

and broke the air bag light." This made the air bag warning light "inoperable so you couldn't see it was on" and therefore, the driver could not tell "if the system is working or not." N.T., 5/21/02, at 137–38. When Corporal Craig Fenstermacher of the Pennsylvania State Police, working undercover, test drove vehicle 1, he noticed that the air bag light "flashed continuously" (indicating a problem with the air bag system), and that the passenger side air bag compartment was improperly set. When he asked appellant whether the air bags had been deployed, appellant stated that they had been deployed and were not operational.[4] Despite appellant's (truthful) statements about the air bag system to Cpl. Fenstermacher, the vehicle's "buyer's guide" (which was posted on the passenger side rear window of vehicle 1) stated that the car had "dual air bags." This statement implied, or "reinforced a false impression," that the car had two functioning air bags by using the statement "dual air bags." The sign itself was a substantial step in committing the crime of theft by deception. The statement "dual air bags" (which created the false impression) was intentional because it was handwritten onto the form instead of the words being pre-printed on the form. The fact that appellant ultimately corrected the buyer's guide is not important because appellant committed the crime of attempt at the moment the buyer's guide was posted, which occurred before Cpl. Fenstermacher walked onto the sales lot.

¶ 26 Also, appellant indicated to Cpl. Fenstermacher that the car had been in an accident, but "there was very minor damage caused by this accident," and the dam-

---

4. Cpl. Fenstermacher's testimony, on its face, implies that appellant only stated that one air bag had been deployed. "He [appellant] indicated that it was [deployed]. He indicated it had been repaired and it was not operation-

al." N.T., 5/21/02, at 192. In light of Cpl. Fenstermacher's testimony, however, it is clear to us that the statement was meant to include both air bags.

age amounted to a repair bill of only $300. N.T., 5/21/02, at 192. The record indicates that the damage to the vehicles far exceeded $300.

¶ 27 Appellant made a number of misrepresentations regarding vehicle 1. Despite the fact that some misrepresentations were ultimately corrected, there was sufficient evidence to establish that appellant attempted to commit theft by deception.

¶ 28 Vehicle 4 was a 1996 Mercury Grand Marquis. Mr. Gregory testified that, at appellant's direction, he either covered up the air bag light or removed the air bag light bulb on vehicle 4. The state police tested vehicle 4 and found that the vehicle's air bags were not operational. Just as in vehicle 1, the buyer's guide indicated that the vehicle had "dual air bags." This misrepresentation is sufficient to prove that appellant attempted to commit theft by deception.

¶ 29 Vehicle 7 was a 1996 Chevrolet Corsica. Like vehicles 1 and 4, vehicle 7's air bags were inoperable. Apparently, when the air bag system was repaired, an incorrect part was used, and that caused the system to become inoperable. The buyer's guide for vehicle 7, however, did not contain any statement that the car had a dual air bag system. Therefore, there was insufficient evidence to show that appellant attempted to deceive buyers regarding this vehicle. Appellant's conviction for attempted theft by deception as to vehicle 7 must be reversed.

¶ 30 Vehicle 8 was a 1998 Chevrolet Lumina. This vehicle also had inoperable air bags. Similar to vehicles 1 and 4, the buyer's guide indicated that the car

had functioning dual air bags. There was, however, no evidence presented to indicate appellant or any of his employees knew that there was a problem with the air bags. Therefore, there was insufficient evidence for a jury to conclude that appellant committed attempted theft by deception.

¶ 31 Vehicle 9 was a 1997 Ford Escort. This vehicle's air bag system was also inoperative. The light bulb of the indicator light that warned the driver of an air bag malfunction "had tape over the bulb contacts so it would not light." N.T., 5/22/02, at 268. Additionally, the documentation given to appellant from Enterprise Leasing Company indicated that the air bag system needed to be replaced. Hence, appellant and his employees knew of this problem. Finally, the buyer's guide indicated that the vehicle had functioning dual air bags. Therefore, there was sufficient evidence to convict appellant of attempted theft by deception.

¶ 32 Appellant next contends (in Point III) that all his theft convictions must be reversed because the jury found that there was no diminution in value. It is true that the crime of theft by deception "does not … include falsity as to matters having no pecuniary significance" (18 Pa. C.S.A. § 3922(b)), and that for the crime to be a felony the amount involved must exceed $2,000 (18 Pa.C.S.A. § 3903(a.1)). The jury's finding, however, is of no significance. The vehicles that were actually purchased were all purchased by various customers for over $2,000.[5]

¶ 33 The vehicles that were not purchased by customers of Krystal were originally purchased by appellant from other

---

5. Vehicle 14 was sold by appellant for $33,000; vehicle 15 for $10,000; vehicle 17 for $10,975; vehicle 24 for $10,500; vehicle 25 for $11,200; vehicle 26 for $14,040; vehi-cle 29 for about $15,000; vehicle 30 for $22,202; vehicle 31 for about $13,000; and vehicle 32 for $22,113.

dealers and companies. He purchased vehicles 7, 8, and 9 for over $2,000.[6] Also, the price affixed to each of these vehicles by appellant was $12,995, $18,995, and $11,995 respectively. Appellant's prices for each of these vehicles were well over $2,000, and therefore the vehicles were of pecuniary interest.

¶ 34 The record indicates that vehicle 1 had an asking price of $13,995. Also, appellant attempted to sell Cpl. Fenstermacher the vehicle for $11,200. Both figures are well over the $2,000 statutory mark.

¶ 35 There was no evidence of any amount paid by appellant regarding vehicle number 4. The record indicates, however, appellant's asking price of $19,995. This price is also well over the $2,000 statutory mark. Accordingly, appellant's contentions in Point III of his brief are without merit.

▮▮▮ ¶ 36 Next, appellant contends (in Point IV) that there was insufficient evidence to sustain his convictions for tampering with public records, 18 Pa.C.S.A. § 4911, regarding vehicle 17 because the vehicles did not meet the definition (statutory or regulatory) of a reconstructed vehicle. As we stated above, the statutory and the regulatory definitions of a reconstructed vehicle were not met, primarily because a certificate of salvage was never issued and there was no evidence that the Department of Transportation determined that the vehicles were "readily recognizable" as vehicles of a "generally recognized make or model." 75 Pa.C.S.A. § 102; 67 Pa.Code § 19.2(ii)(B). Because the Commonwealth did not show that the vehicles met the definitions of reconstructed vehi-

cles, we must reverse appellant's conviction on tampering with public records.

## SENTENCE OF RESTITUTION

¶ 37 In Point V of his brief, appellant contends that the trial court improperly imposed a sentence of restitution because specific market and sale values were not established during the trial.

▮▮▮ ¶ 38 18 Pa.C.S.A. § 1106 authorizes sentences of restitution "for any crime wherein property has been stolen, converted or otherwise unlawfully obtained, or its value substantially decreased as a direct result of the crime". 18 Pa. C.S.A. § 1106. Sentences of restitution are within the sound discretion of the trial court. *Commonwealth v. Gerulis*, 420 Pa.Super. 266, 616 A.2d 686, 697 (1992); *Commonwealth v. McLaughlin*, 393 Pa.Super. 277, 574 A.2d 610, 617 (1990); *Commonwealth v. Balisteri*, 329 Pa.Super. 148, 478 A.2d 5, 9 (1984). Since appellant is challenging the discretionary aspects of his sentence, we must consider his brief on this issue a petition for permission to appeal. *Commonwealth v. Yanoff*, 456 Pa.Super. 222, 690 A.2d 260, 267 (1997). *See also Commonwealth v. Tuladziecki*, 513 Pa. 508, 522 A.2d 17 (1987); 42 Pa. C.S.A. § 9781(b).

▮▮▮ ¶ 39 For us to reach the merits of such an issue, four prerequisites must be met:

1) the issue must be specifically preserved in a timely motion to modify sentence; 2) a timely notice of appeal must be filed; 3) the issue must be set forth in the issues to be raised on appeal in the statement of questions presented; and 4) the issue must be included within a concise statement of reasons for allow-

---

6. Vehicle 7 was purchased by appellant for $3,300; vehicle 8 for $7,000; and vehicle 9 for $2,500.

ance of appeal which demonstrates a substantial question that the sentence imposed was not appropriate under the Sentencing Code.

*Yanoff,* 690 A.2d at 267 (citations and footnote omitted). We find that the first two prerequisites are met. Appellant also met the fourth prerequisite, raising a substantial question. *See Commonwealth v. Walker,* 446 Pa.Super. 43, 666 A.2d 301, 310 (1995) (concluding that a substantial question is raised when an appellant argues that sentence of restitution is not supported by the record). Prerequisite three, however, has not been met. Appellant failed to include this issue in his statement of questions presented for review. *See* appellant's brief at 6. While we could find that appellant waived this issue because he failed to comply with the rules, we will not do so because the issue is clearly identified in appellant's table of contents. Therefore, this formal omission does not significantly hamper our review of appellant's claims. *See Walker,* 666 A.2d at 306. We therefore proceed to discuss the merits of appellant's claim.

▮▮▮▮ ¶ 40 "Restitution may be imposed only for those crimes to property or person where the victim suffered a loss that flows from the conduct that forms the basis of the crime for which the defendant is held criminally accountable." *Commonwealth v. Dohner,* 725 A.2d 822, 824 (Pa.Super.1999); *Commonwealth v. Harner,* 533 Pa. 14, 617 A.2d 702, 705 (1992).

In computing the amount of restitution the sentencing court "[s]hall consider the extent of injury suffered by the victim and such other matters as it deems appropriate." 18 Pa.C.S.A. § 1106(c)(1)." To determine the correct amount of restitution, a "but-for" test is used—damages which occur as a direct result of the crime are those which should not have occurred but for the defendant's criminal conduct.

*Gerulis,* 616 A.2d at 697. *See also Commonwealth v. Penrod,* 396 Pa.Super. 221, 578 A.2d 486, 490 n. 1 (1990). "Because restitution is a sentence, the amount ordered must be supported by the record; it may not be speculative or excessive." *Dohner,* 725 A.2d at 824 (citing *Commonwealth v. Reed,* 374 Pa.Super. 510, 543 A.2d 587, 589 (1988)). The payment of restitution ordered by the court cannot be in excess of the damage caused by the defendant. *Gerulis,* 616 A.2d at 697 (citing *Commonwealth v. Boyles,* 407 Pa.Super. 343, 595 A.2d 1180, 1188 (1991)).

▮▮▮ ¶ 41 Appellant argues that the sentence of restitution is not supported by the record because the specific values for the vehicles were not brought out during trial, and that the pre-sentence investigation report is not part of the record on which the sentence may rely. We disagree. A pre-sentence report is part of the record and may be considered by the sentencing court. *See Yanoff,* 690 A.2d at 266 (use of pre-sentence report information by sentencing court is permissible); *Commonwealth v. Masip,* 389 Pa.Super. 365, 567 A.2d 331, 336 (1989) ("A presentence report constitutes part of the record and speaks for itself. . . . It is presumed to be valid and need not be supported by evidence unless and until it is challenged by the defendant.").

¶ 42 Appellant did not challenge his sentence of restitution at the sentencing hearing. In fact, appellant, through counsel, agreed to the restitution figure. Appellant's attorney said that "we're just going to go along with Mr. Dean's values." The court responded "That's $62,741," [7] and ap-

---

7. The actual figure indicated in the pre-sentence report was $62,745. The court ultimately ordered $62,745 in restitution.

pellant's attorney replied "That is correct." Also, appellant's attorney said that "Mr. Pappas did instruct me that the restitution is not the big deal, and Mr. Pappas ... said Westedge Corporation will pay whatever amount the Court decrees." N.T., 8/21/02, at 19–20. The amount agreed to during the sentencing proceedings was the same amount suggested by the pre-sentence report. We see no reason to disturb this agreed upon sentence.

## INEFFECTIVE ASSISTANCE OF COUNSEL

¶ 43 Appellant next contends that he was denied effective assistance of counsel when trial counsel failed to re-raise a motion for a change of venue prior to trial. Before we reach the merits of this issue, an analysis under *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726 (2002), and its progeny is necessary.[8]

¶ 44 Under *Grant*, claims of ineffective assistance of counsel generally may not be raised on direct appeal. Rather, ineffective assistance claims are properly raised during collateral review in motions pursuant to the Post–Conviction Relief Act (PCRA). *Grant*, 813 A.2d at 738. Unless an exception to *Grant* exists, we must defer appellant's ineffective assistance claim until review pursuant to the Post–Conviction Relief Act.

¶ 45 *Commonwealth v. Bomar*, 573 Pa. 426, 826 A.2d 831 (2003), created an exception to *Grant* that is applicable to the instant case. An appellant may raise the issue of ineffective assistance of trial counsel on direct appeal if there exists an adequate trial court record on the issue of trial counsel ineffectiveness. *Bomar*, 826 A.2d at 854–55. In *Bomar*, our Supreme

Court held that direct review of ineffective assistance claims is permissible where

appellant's claims of ineffective assistance of counsel were properly raised and preserved in the trial court. Following sentencing, trial counsel withdrew from the case and present counsel entered the matter and filed post-sentence motions on appellant's behalf, raising, *inter alia*, the same claims of trial counsel ineffectiveness now raised in this Court. The trial court conducted hearings on the post-sentence motions ... at which appellant's trial counsel testified. Moreover, the trial court addressed the ineffectiveness claims in its opinion.

*Bomar*, 826 A.2d at 853. This is the exact situation that exists in appellant's case. Appellant's trial counsel petitioned to withdraw on August 1, 2002, and the trial court granted this petition on September 4, 2002. Appellant's new counsel (and counsel on this appeal) filed Defendant's Supplemental Post–Sentence Motion on October 22, 2002. This motion specifically claimed that trial counsel was ineffective for failing to re-raise the change of venue request. A hearing was held on November 22, 2002, where appellant and appellant's two trial attorneys testified. The court ordered the issue of ineffective assistance to be briefed, and appellant filed his brief on December 2, 2002. The Commonwealth filed a response on December 10, 2002. The court then rendered a decision on the issue, which was filed on December 13, 2002. These facts clearly indicate that the trial court had an opportunity to fully review the claim and create an extensive record, including obtaining the testimony of trial counsel. We therefore believe that appellant's case falls squarely within the *Bomar*

---

8. We note that appellant *did not* raise *Grant* as an issue on appeal. In fact, appellant failed to cite to *Grant*, a seminal case in ineffective assistance of counsel jurisprudence.

exception to *Grant.* We will therefore analyze the merits of appellant's ineffective assistance of counsel claim.

¶ 46 When analyzing claims of ineffective assistance of counsel, we begin with the presumption that counsel was effective. *Commonwealth v. Miller,* 572 Pa. 623, 819 A.2d 504, 517 (2002); *Commonwealth v. Duda,* 831 A.2d 728, 732 (Pa.Super.2003). An appellant establishes ineffective assistance of counsel when he demonstrates that: "[1] the underlying claim is of arguable merit; [2] that counsel's action or inaction was not grounded on any reasonable basis designed to effectuate the appellant's interest; and finally, [3] that counsel's action or inaction was prejudicial to the client." *Commonwealth v. Costa,* 560 Pa. 95, 742 A.2d 1076–77 (1999). *See also Commonwealth v. Clayton,* 572 Pa. 395, 816 A.2d 217 (2002); *Commonwealth v. Johnson,* 572 Pa. 283, 815 A.2d 563 (2002). For an action (or inaction) by counsel to be considered prejudicial to the client, there must be a "reasonable probability that the outcome of the proceedings would have been different." *Johnson,* 815 A.2d at 573. All three prongs of this test must be satisfied. If an appellant fails to meet even one prong of the test, his conviction will not be reversed on the basis of ineffective assistance of counsel.

■■■■■ ¶ 47 First, we will determine if the underlying claim, the issue of change of venue, had any merit. The factors for determining whether a change of venue based on pretrial publicity should be granted are well established.

> The mere existence of pretrial publicity does not warrant a presumption of prejudice. If pretrial publicity occurred, its nature and effect on the community must be considered. Factors to consider are whether the publicity was sensational, inflammatory, and slanted toward conviction rather than factual and objec-
> tive; whether the publicity revealed the accused's prior criminal record, if any; whether it referred to confessions, admissions, or reenactments of the crime by the accused; and whether such information is the product of reports by the police or prosecuting officers. If any of these factors exists, the publicity is deemed to be inherently prejudicial, and we must inquire whether the publicity has been so extensive, so sustained, and so pervasive that the community must be deemed to have been saturated with it. Finally, even if there has been inherently prejudicial publicity which has saturated the community, no change of venue [or venire] is warranted if the passage of time has significantly dissipated the prejudicial effects of the publicity.

*Bomar,* 826 A.2d at 858 (citations omitted) (citing *Commonwealth v. Chambers,* 546 Pa. 370, 685 A.2d 96, 104 (1996)).

¶ 48 Appellant argues that the rule in *Commonwealth v. Brado,* 470 Pa. 306, 368 A.2d 643 (1977), required the case to be transferred out of Adams County due to publicity. *Brado* involved a newspaper article, published on the morning of jury selection, which highly criticized the defense of voluntary intoxication. Our Supreme Court, in reversing and remanding for a new trial, stated:

> While the jurors may not have considered themselves to be prejudiced by the newspaper editorial and cartoon, it is most likely that at the very least, it alerted them to be extremely critical of a defense such as Brado was about to present. Anyone who was exposed to such news reporting would surely have formed some opinion as to intoxication as a defense to criminal conduct. Such an influence from outside the courtroom affecting the impartiality of the jurors cannot be tolerated in a criminal tri-

al.... At a minimum, the editorial would constitute a public response to [*Commonwealth v.*] *Graves* [461 Pa. 118, 334 A.2d 661 (1975) ]. The jury's knowledge of this response presents a situation where the jury is aware of the verdict the public expects, prior to rendering its verdict.

The editorial undoubtedly could have had the effect of creating outrage among members of the public against this Court for its ruling regarding an intoxication defense. The probability that the jurors would be affected by the article and direct their anger against the defendant, who presented that very defense the day the articles were published, was so high that the article must be deemed inherently prejudicial to the defendant, Brado. Pursuant to the rule of *Commonwealth v. Pierce*, [451 Pa. 190, 303 A.2d 209 (Pa.1973) ], once prejudice of this nature is found, Brado is not required to point to any actual prejudice on the part of any particular juror.

*Commonwealth v. Brado,* 470 Pa. 306, 368 A.2d 643, 645 (1977).

¶ 49 In *Commonwealth v. Pierce,* 451 Pa. 190, 303 A.2d 209 (1973), our Supreme Court also found that pre-trial publicity was so pervasive that it required a change of venue. "While much of the publicity was routine, factual, and wholly lacking inflammatory content, a great deal of publicity about Pierce was *emotionally charged and inflammatory, and clearly pointed to his guilt.*" *Commonwealth v. Frazier,* 471 Pa. 121, 369 A.2d 1224, 1227 (1977) (quoting *Pierce* ) (emphasis added in *Frazier* ).

¶ 50 In contrast, *Commonwealth v. Kichline,* 468 Pa. 265, 361 A.2d 282 (1976), found publicity that was not emotionally charged, inflammatory, or excessive did not require a change of venue. *Frazier,* 369 A.2d at 1228 (citing *Kichline* ).

¶ 51 The *Frazier* Court found that the publicity was not emotionally charged, however, the Court remanded for a new trial because the publicity "exposed potential jurors first to appellant's prior criminal record, and second, to statements made by him admitting that he committed the killing." *Frazier,* 369 A.2d at 1228.

¶ 52 The publicity in appellant's case is neither extensive, nor emotionally charged. We counted fifty-two newspaper articles that were brought to the attention of the trial court. These articles spanned a period of five years. During the year of the trial (2002), there were only nine articles, three of which were published before appellant's trial began. We do not see how this amount of publicity amounts to "excessive" publicity, even in a small community, such as Gettysburg.

¶ 53 Our review of the publicity indicates that most of the articles criticized the lengthy delays and multiple continuances which were granted in the case. While these articles were "emotionally charged," they were so only because of the delays. Most of these articles did not point to appellant's guilt.

¶ 54 A number of articles discussed prior criminal and civil actions brought against appellant. "In the past, we have not hesitated to order new trials in cases where the jury was told, without proper safeguards, of an accused's prior criminal record." *Frazier,* 369 A.2d at 1228. The articles published within the year prior to the trial that mentioned any prior (or current) proceedings were not so inflammatory as to require a change of venue. Information published described: a conviction for a summary offense for non-payment of employees and the related civil suit; a civil suit to revoke appellant's business license; a criminal charge for writing bad checks; and the dismissal of the bad check charge.

The only conviction was for a summary offense, akin to a parking or speeding ticket and the other criminal charge was dismissed. If we required a change of venue every time a defendant received "bad press," few defendants would be tried in the county where the offense was committed.

¶ 55 We therefore believe that the underlying issue of change of venue, upon which appellant based his ineffective assistance of counsel claim, is without merit. Accordingly, appellant failed to prove his counsel was ineffective for failing to raise this issue and we must reject appellant's claim.

### RECUSAL OF TRIAL COURT JUDGE

¶ 56 Appellant's final issue questions whether the trial court abused its discretion when it denied appellant's motion for recusal of the trial judge. We find the issue was waived by appellant. "It is well-settled that a party seeking recusal or disqualification must raise the objection at the earliest possible moment or that party will suffer the consequence of being time barred." *Commonwealth v. Stafford,* 749 A.2d 489, 501 (Pa.Super.2000) (quotation marks and citations omitted); *Commonwealth v. Boyd,* 835 A.2d 812, 820 (Pa.Super.2003).

¶ 57 When the issue of recusal was presented during pre-trial motions, appellant said:

> Your Honor, I feel comfortable with you .... You know, I think that you're a fair man to be honest with you. I think that you're very capable.... We didn't file a motion to that effect that that would have never come up had you not asked what the other situations were when Mr. Welch [appellant's pre-trial attorney] said, yes, we discussed that, and Mr. Welch also put in that we even discussed should we be filing a motion to recuse

> you. I was comfortable with Mr. Welch's explanation to that at the time that he told me that you said those words in jest.

N.T., 9/13/01, at 26–28. We are comfortable concluding that appellant's statements waived the recusal issue.

### CONCLUSION

¶ 58 Appellant has convinced us that there was insufficient evidence for the following convictions: theft by deception concerning vehicles 24 and 25; attempted theft by deception concerning vehicles 7 and 8; and tampering with public records concerning vehicle 17. Therefore, we reverse the order of the trial court as it pertains to these charges. As to all other vehicles and issues, we affirm the order of the trial court. We remand this case to the Adams County Court of Common Pleas for further proceedings not inconsistent with this opinion.

¶ 59 AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings. Jurisdiction relinquished.

¶ 60 KLEIN, J., concurs in the result.