J-A17001-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| CHERELLE PARKER | |
| Appellant | No. 231 EDA 2014 |

Appeal from the Order December 23, 2013
In the Court of Common Pleas of Philadelphia Municipal Court -
Traffic Division at No(s): MC-51-CR-0018485-2011

BEFORE:  GANTMAN, P.J., PANELLA, J., and STABILE, J.

MEMORANDUM BY GANTMAN, P.J.:                **FILED AUGUST 22, 2014**

Appellant, Cherelle Parker, appeals from the order entered in the Philadelphia County Court of Common Pleas, denying her petition for a writ of *certiorari* filed after the Municipal Court found her guilty of two (2) counts of driving under the influence of alcohol ("DUI").[1]  We affirm.

The relevant facts and procedural history of this appeal are as follows. On April 30, 2011, at approximately 12:18 a.m., Philadelphia Police Officers Israel Miranda and Stephanie Allen were on routine patrol when they observed Appellant driving a silver Jeep Cherokee.  Appellant drove eastbound on Haines Street, which is a one-way street for westbound traffic only.  At the intersection of Haines and Baynton Streets, Appellant made a

---

[1] 75 Pa.C.S.A. § 3802(a)(1), (c).

left turn onto Baynton Street without using a turn signal. At that point, the officers activated the emergency lights and sirens on their patrol car and initiated a traffic stop. Appellant immediately pulled over on Baynton Street.

Officer Miranda approached the driver's side of the vehicle, and Officer Allen approached the passenger's side. Officer Miranda initiated contact and asked Appellant for her driver's license, registration, and proof of insurance. Officer Miranda smelled the odor of alcohol on Appellant's breath, and he asked Appellant if she had been drinking. Appellant responded affirmatively. As Appellant searched her purse for the paperwork, she appeared disoriented. The officers noticed Appellant had glassy eyes, and her speech was slow. Officer Miranda ordered Appellant to step out of the vehicle, and she complied. Appellant, however, had trouble standing as she alighted from vehicle. Ultimately, the officers arrested Appellant for DUI. Subsequent testing revealed Appellant's blood alcohol content was 0.16%.

The Commonwealth filed a criminal complaint charging Appellant with DUI. On September 20, 2011, the Municipal Court conducted a hearing. At the beginning of the hearing, Appellant orally moved to suppress "any and all evidence acquired against [Appellant's] interest." (N.T. Suppression Hearing, 9/20/11, at 5; R.R. at 2). Appellant argued that the officers conducted an illegal vehicle stop without probable cause or reasonable suspicion. Appellant also argued that the officers did not have probable

cause to support the arrest. After receiving testimony from Officer Miranda,

Officer Allen, and Appellant, the court took the matter under advisement.

On November 1, 2011, the Municipal Court granted Appellant's

suppression motion, issuing the following on-the-record statement:

> Let me make it clear for the record that there are two major factors for the findings of fact and conclusions of law in this case. The first factor on which I base these findings of fact and conclusions of law was the testimony of Police Officer Miranda with regard to his ability to reasonably determine based on his observations and personal and professional experience whether [Appellant] was under the influence of alcohol. Police Officer Miranda testified that he has arrested approximately two hundred suspects for DUI and yet in his personal and professional life he has only observed one hundred individuals who were intoxicated. Taking Police Officer Miranda's testimony literally, one can reasonably conclude that fifty percent of all those arrested by him for DUI were not intoxicated, which is disturbing.
>
> However, Police Officer Miranda's testimony went even further when he indicated, quote, no one can drink any amount of alcohol without being impaired, unquote. Police Officer Miranda's testimony with regard to his percentages of arrest for DUI taken together with his zero tolerance for drinking raises a serious doubt with this [c]ourt as to his ability to reasonably determine whether there was sufficient reasonable suspicion or probable cause to arrest [Appellant].
>
> The second and most troubling factor for these findings of fact and conclusions of law is Police Officer Miranda clearly causing himself and his partner to testify in a less than truthful manner on very obvious and critical points before this [c]ourt. Both Police Officers Miranda and Allen testified unequivocally that there was, quote, no traffic in the vicinity of Germantown and Haines, unquote, around midnight on Friday, April 29, 2011. For both officers to testify that from 11:30 p.m. to 12:30 a.m. there were no cars driving on the streets of Germantown on a Friday night in the springtime was incredible based on both my

personal experience as a Philadelphia native and based on easily accessible crime statistics for the 14th Police District. If these officers' testimonies were accurate, then the 14th District would not be designated as it is by the Philadelphia Police Department as one of the worst high crime, high arrest areas in the city. Sadly, it was not until Police Officer Allen, under strenuous cross-examination by defense counsel, that she contradicted her own earlier testimony, and equally importantly, that of her fellow partner when she testified, quote, there was a car in front of us on the street, unquote. The reluctant admission that another vehicle or vehicles was or were on the street at the time of the arrest raises serious doubts about the police officers' veracity in this case and, most importantly, about the police officers' ability to observe. It is now clear for the record that the officers' views were obstructed by another vehicle at the time they allege to have observed [Appellant] driving her vehicle the wrong way.

The lack of veracity as to traffic coupled with the sheer number of discrepancies between the testimony of the officers and the police paperwork makes it impossible for this [c]ourt to accept as true any of their testimony. For example, Officers Miranda and Allen testified that [Appellant's] eyes were glassy. However, that fact was never mentioned in the police paperwork. The police paperwork clearly indicated that [Appellant's] eyes were normal. This [c]ourt finds Police Officer Miranda's testimony woefully insufficient with regard to his percentages of arrests for DUI, especially taken together with his zero tolerance statement about intoxication. And this [c]ourt further finds it cannot rely upon the testimony of either Police Officer Allen or Police Officer Miranda because of their lack of veracity.

Consequently, this [c]ourt concludes that the Commonwealth has not met its burden for the stop, reasonable suspicion, and probable cause for the arrest and this [c]ourt, therefore, grants the motion to suppress.

(N.T. Hearing, 11/1/11, at 3-7; R.R. at 40-44).

On November 14, 2011, the Commonwealth filed a motion for reconsideration and new matter. In addition to asking the court to reconsider the suppression ruling, the Commonwealth requested the recusal of the Municipal Court jurist due to his "Facebook friendship" with Appellant. (Motion to Reconsider and New Matter, filed 11/14/11, at 4). On November 15, 2011, the court denied the motion to reconsider the suppression ruling. The court denied the recusal request on November 21, 2011.

On November 29, 2011, the Commonwealth filed a notice of appeal with the Court of Common Pleas ("CCP"). On January 17, 2012, the CCP reversed the Municipal Court's grant of Appellant's suppression motion. In a separate order entered that same day, the CCP granted the Commonwealth's recusal request. The CCP did not issue opinions in conjunction with the orders. Appellant subsequently sought permission to file a premature notice of appeal from the CCP's decisions, which this Court denied on March 30, 2012.

On January 16, 2013, Appellant appeared for trial before a specially assigned, out-of-county jurist. That same day, the Municipal Court found Appellant guilty of two (2) counts of DUI and sentenced her to seventy-two (72) hours to six (6) months' imprisonment. Appellant timely filed a petition for writ of *certiorari* with the CCP on January 24, 2013. On December 23, 2013, the CCP denied the petition for writ of *certiorari*.

Appellant timely filed a notice of appeal on January 14, 2014. On January 23, 2014, the court ordered Appellant to file a concise statement of errors complained of on appeal, pursuant to Pa.R.A.P 1925(b). Appellant timely filed a Rule 1925(b) statement on February 6, 2014.

Appellant raises two issues for our review:

> WHETHER THE TRIAL COURT'S GRANT OF THE MOTION TO SUPPRESS ON GROUNDS OF CREDIBILITY COULD VALIDLY BE REVERSED BY THE COURT OF COMMON PLEAS.
>
> WHETHER THE COURT OF COMMON PLEAS ERRED IN ORDERING THE RECUSAL OF [THE] MUNICIPAL COURT JUDGE….

(Appellant's Brief at 3).

In her first issue, Appellant asserts the Municipal Court properly granted her suppression motion in light of numerous inconsistencies in the Commonwealth's evidence. Specifically, Appellant contends the officers' testimony about Appellant's glassy eyes was contradicted by the police paperwork, which characterized Appellant's eyes as normal. Appellant maintains Officer Miranda testified that there were no other vehicles on the road at the time of the traffic stop, but Officer Allen conceded that there was one other vehicle directly in front of the officers' patrol car immediately before the stop. Appellant also emphasizes Officer Miranda's purported statement that any consumption of alcohol renders an individual incapable of safe driving. Appellant claims Officer Miranda's statement "is in direct contradiction of Pennsylvania law." (Appellant's Brief at 17). On these

grounds, Appellant insists that the record supported the Municipal Court's original determination that the officers were not credible. Appellant concludes the CCP erroneously reversed the Municipal Court's suppression ruling. We disagree.

We review the denial of a suppression motion as follows:

> Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct.
>
> > [W]e may consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the court erred in reaching its legal conclusions based upon the facts.

**Commonwealth v. Williams**, 941 A.2d 14, 26-27 (Pa.Super. 2008) (*en banc*) (internal citations and quotation marks omitted). Further, "Both Municipal and Common Pleas Courts are bound by the same law and apply the same standards in ruling upon the merits of the suppression motion." **Commonwealth v. Harmon**, 469 Pa. 490, 498, 366 A.2d 895, 899 (1976) (internal footnote omitted). "The judges of both courts are trained in the law and their decisions are subject to review on post-trial motions and upon appeal to the appellate tribunals of this Commonwealth." **Id.**

Section 6308 of the Motor Vehicle Code provides:

### § 6308. Investigation by police officers

\*    \*    \*

    **(b)  Authority of police officer.**—Whenever a police officer is engaged in a systematic program of checking vehicles or drivers or has **reasonable suspicion** that a violation of this title is occurring or has occurred, he may stop a vehicle, upon request or signal, for the purpose of checking the vehicle's registration, proof of financial responsibility, vehicle identification number or engine number or the driver's license, or to secure such other information as the officer may reasonably believe to be necessary to enforce the provisions of this title.

75 Pa.C.S.A. § 6308(b) (emphasis added).  "Mere reasonable suspicion will not justify a vehicle stop when the driver's detention cannot serve an investigatory purpose relevant to the suspected violation." *Commonwealth v. Feczko*, 10 A.3d 1285, 1291 (Pa.Super. 2010), *appeal denied*, 611 Pa. 650, 25 A.3d 327 (2011).  "In such an instance, 'it is [incumbent] upon the officer to articulate specific facts possessed by him, at the time of the questioned stop, **which would provide probable cause to believe that the vehicle or the driver was in violation of some provision of the Code**.'" *Id.* (emphasis in original).

    "Probable cause is made out when the facts and circumstances which are within the knowledge of the officer at the time of the arrest, and of which he has reasonably trustworthy information, are sufficient to warrant a [person] of reasonable caution in the belief that the suspect has committed or is committing a crime." *Commonwealth v. Thompson*, 604 Pa. 198, 203, 985 A.2d 928, 931 (2009) (internal quotation marks omitted).

- 8 -

The question we ask is not whether the officer's belief was correct or more likely true than false. Rather, we require **only a probability**, and not a *prima facie* showing, of criminal activity. In determining whether probable cause exists, we apply a totality of the circumstances test.

*Id.* (emphasis in original) (internal citations and quotation marks omitted).

Pennsylvania law makes clear, however, that a police officer has probable cause to stop a motor vehicle if the officer observed a traffic code violation, even if it is a minor offense. *Commonwealth v. Chase*, 599 Pa. 80, 89, 960 A.2d 108, 113 (2008).

Section 3308 of the Motor Vehicle Code provides:

**§ 3308. One-way roadways and rotary traffic islands**

\* \* \*

**(b) Driving on one-way roadway.**—Upon a roadway designated for one-way traffic, a vehicle shall be driven only in the direction designated at all or such times as shall be indicated by official traffic-control devices.

75 Pa.C.S.A. § 3308(b). Further, Section 3334 provides:

**§ 3334. Turning movements and required signals**

**(a) General rule.**—Upon a roadway no person shall turn a vehicle or move from one traffic lane to another or enter the traffic stream from a parked position unless and until the movement can be made with reasonable safety nor without giving an appropriate signal in the manner provided in this section.

75 Pa.C.S.A. § 3334(a).

Instantly, the original Municipal Court conducted a suppression hearing where the Commonwealth presented testimony from Officers Miranda and

Allen. Officer Miranda testified that he and Officer Allen were on patrol when they observed Appellant driving eastbound on Haines Street. Officer Miranda explained that Haines Street is a one-way street for westbound traffic only. Officer Miranda watched Appellant's vehicle swerve as it proceeded down Haines Street. At the intersection of Haines and Baynton Streets, Appellant made a left turn without signaling. (*See* N.T. Suppression Hearing at 69; R.R. at 18.) Officer Miranda explained that no other vehicles interfered with his ability to see Appellant's vehicle. At that point, the officers initiated a traffic stop and Appellant pulled over on Baynton Street.

Officer Miranda approached the driver's side of Appellant's vehicle, saw Appellant behind the wheel, and asked Appellant for her paperwork. As Appellant fumbled through her handbag, Officer Miranda asked Appellant whether she had been drinking. Appellant indicated she had consumed "two beers and a couple of chocolate martinis." (*Id.* at 18; R.R. at 5). Upon interacting with Appellant, Officer Miranda smelled a strong odor of alcohol on Appellant's breath. The officer also noticed that Appellant "had glassy eyes and she was a little disoriented…." (*Id.*) Officer Miranda asked Appellant to step out of her vehicle, and she complied. Officer Miranda commented, "As she was stepping out she stumbled a little bit, so I grabbed her so she wouldn't fall." (*Id.* at 19-20; R.R. at 5). Appellant subsequently failed to produce her identification or paperwork for the vehicle. Officer

Allen conducted a pat down search of Appellant's person, and the officers arrested Appellant for DUI.

After having the officer describe his interaction with Appellant, the prosecutor asked Officer Miranda about his DUI detection training:

> [COMMONWEALTH]: Now, do you have training in detection of impaired drivers?
>
> [WITNESS]: Yes, they teach us that in the Academy.
>
> [COMMONWEALTH]: And what's that training they give you in the Academy?
>
> [WITNESS]: We go through all the motor vehicle laws and all the DUIs, how to detect DUIs.
>
> [COMMONWEALTH]: I see. And have you ever made a DUI arrest before?
>
> [WITNESS]: Yes.
>
> [COMMONWEALTH]: About how many times?
>
> [WITNESS]: I'd say about 200 in my career.
>
> [COMMONWEALTH]: And have you had occasions to see intoxicated persons during the course of your career and in your personal life?
>
> [WITNESS]: Yes.
>
> [COMMONWEALTH]: And about how many times?
>
> [WITNESS]: About 100.

(*Id.* at 25-26; R.R. at 7). Based upon Officer Miranda's professional and personal experiences, the officer believed Appellant was incapable of safe driving on the night of her arrest.

- 11 -

On cross-examination, defense counsel attacked Officer Miranda's statements about his experiences with intoxicated persons:

> [COUNSEL]: Okay. You said, one of the questions you said on direct was that you had 200 DUI arrests?
>
> [WITNESS]: Yes.
>
> [COUNSEL]: You said you've only come into contact with 100 people intoxicated?
>
> [WITNESS]: That's in—

(*Id.* at 38; R.R. at 10). Officer Miranda attempted to clarify that he was comparing the number of intoxicated persons he had encountered during his police career to the number of intoxicated persons he had encountered in his personal life. Defense counsel, however, continued to press the officer with questions about whether he had arrested individuals that he believed were not intoxicated.

Later during cross-examination, defense counsel questioned Officer Miranda about the amount of alcohol a person can drink before being unable to operate a vehicle:

> [COUNSEL]: Would you agree people can drink alcohol and operate a vehicle?
>
> [WITNESS]: No.
>
> [COUNSEL]: You can't have one beer and operate a vehicle, that's your testimony, right?
>
> THE COURT: Give him a chance to answer the questions.

[WITNESS]: My testimony is that if you're drinking any type of alcohol and driving, more than likely you **might** be impaired.

(*Id.* at 55; R.R. at 14) (emphasis added).

Thereafter, Officer Allen confirmed much of Officer Miranda's testimony. Officer Allen testified she also observed Appellant's vehicle driving in the wrong direction on Haines Street. Officer Allen indicated that the officers were approximately fifty (50) feet away from Appellant's vehicle at the time of their initial observations. During the traffic stop, Officer Allen approached the passenger's side of the vehicle. Although she could not hear Officer Miranda's conversation with Appellant, Officer Allen could see inside the vehicle. Officer Allen described Appellant's actions as follows:

She was disoriented, she was moving rather slow, she kept looking from the back to the front, she was looking around the front. She had containers of food in the car, platters, and she actually spilled a platter of food into the passenger seat, the front passenger seat.

(*Id.* at 79; R.R. at 20).

Officer Miranda flashed a hand signal to notify Officer Allen of his belief that Appellant was intoxicated. After Officer Miranda ordered Appellant out of the vehicle, Officer Allen conducted the pat down search. Appellant "appeared to be a little slow," and she "had glassy eyes." (*Id.* at 82; R.R. at 21). Officer Allen also smelled the odor of alcohol on Appellant's breath. Based upon Officer Allen's training and experiences, she believed Appellant was incapable of safely operating a motor vehicle on the night in question.

- 13 -

On cross-examination, Officer Allen testified that there was another vehicle on the road, directly in front of the officers' patrol car, when they first observed Appellant driving down Haines Street. In response, defense counsel stated, "I thought there [were] no cars on the street?" (*Id.* at 106; R.R. at 27). Officer Allen explained that there were no cars on Baynton Street, where the traffic stop occurred. Further, Officer Allen reiterated that she never lost sight of Appellant's vehicle.

After the Commonwealth rested, Appellant testified on her own behalf. Appellant denied driving down Haines Street on the night of her arrest. Appellant said she left a restaurant on Chelten Avenue at approximately 11:30 p.m. After proceeding southbound on Chelten Avenue, Appellant made a right turn onto Germantown Avenue, followed by a right turn onto Rittenhouse Street. At the intersection of Rittenhouse and Baynton Streets, Appellant claimed to have made a left turn onto Baynton Street. While Appellant indicated that there was traffic in the area of Germantown Avenue, Appellant did not specify whether there were other vehicles traveling on Rittenhouse or Baynton Streets. (*Id.* at 121-22; R.R. at 31).

At the intersection of Baynton and Haines Streets, Appellant saw the flashing lights on the officers' patrol car and pulled over. During the traffic stop, Officer Miranda approached Appellant's vehicle and asked whether she had been drinking. Appellant admitted telling the officer that she had consumed one chocolate martini earlier that evening. Appellant also

admitted that she had taken her shoes off while driving the vehicle. Appellant explained she had been wearing high heels all night, and her feet were sore. Appellant rejected Officer Miranda's contention that she stumbled out of the vehicle; rather, she "had to bend down to finish putting [her] shoes on." (*Id.* at 125; R.R. at 32).

Following the hearing, the original Municipal Court jurist granted Appellant's suppression motion. Nevertheless, the record from the suppression hearing did not support the Municipal Court's findings of fact. Specifically, the Municipal Court emphasized Officer Miranda's statements about the number of intoxicated individuals he had arrested. The court found, "[O]ne can reasonably conclude that fifty percent of all those arrested by him for DUI were not intoxicated, which is disturbing." (*See* N.T. Hearing, 11/1/11, at 4; R.R. at 41.) Here, the Municipal Court mischaracterized Officer Miranda's testimony. Rather than saying that half of the DUI suspects he had arrested were not intoxicated, Officer Miranda was attempting to explain that he had encountered approximately 200 intoxicated drivers as a police officer and another 100 intoxicated individuals in his personal life. (*See* N.T. Suppression Hearing at 25-26, 38-39; R.R. at 7, 10.)

The Municipal Court also misconstrued Officer Miranda's testimony regarding the amount of alcohol an individual can consume before becoming too impaired to drive. The court stated, "Police Officer Miranda's testimony

- 15 -

went even further when he indicated, quote, no one can drink any amount of alcohol without being impaired, unquote." (*See* N.T. Hearing, 11/1/11, at 4; R.R. at 41.) Again, Officer Miranda did not make the statement that the court attributed to him. Rather, Officer Miranda actually said, "My testimony is that if you're drinking any type of alcohol and driving, more than likely you might be impaired." (*See* N.T. Suppression Hearing at 55; R.R. at 14.)

Regarding the number of vehicles on the road at the time of the stop, the court ignored all evidence of record and made a finding based on the jurist's own "personal experience as a Philadelphia native and based on easily accessible crime statistics for the 14th Police District." (*See* N.T. Hearing, 11/1/11 at 5; R.R. at 42.) We reiterate that a suppression court must base its findings of fact solely on the evidence placed on the record during the suppression hearing. *See In re L.J.*, ___ Pa. ___, 79 A.3d 1073 (2013) (explaining language of Pa.R.Crim.P. 581 strongly suggests that record of suppression hearing is intended to be complete record for suppression issues). While Officer Miranda stated that there were no other vehicles on the road, and Officer Allen indicated that there was one vehicle between the officers and Appellant, both officers agreed that they never lost sight of Appellant's vehicle. Moreover, Appellant's own testimony indicated that she turned off Germantown Avenue to avoid traffic, and she did not say that she encountered any other vehicles on the road after exiting Germantown Avenue.

To the extent that the suppression court elaborated on discrepancies between the officers' testimony and the police reports, both officers testified Appellant's eyes were glassy at the time of her arrest. The copies of the police reports included in the certified record make no mention of the condition of Appellant's eyes.[2] Under these circumstances, we cannot say that a discrepancy exists between the officers' testimony and the police reports.

Based upon the foregoing, the record did not support the original Municipal Court's findings. Rather than making findings based on the evidence adduced at the suppression hearing, including Appellant's testimony, the original Municipal Court relied on its own confused interpretation of the officers' testimony and the jurist's personal experience unrelated to the incident at issue. Absent some findings of fact actually supported by the record, the CCP could not allow the suppression ruling to stand. *See Williams, supra*. In light of the evidence establishing that the officers witnessed Appellant committing Motor Vehicle Code violations, and the officers' subsequent observations of *indicia* of intoxication, we conclude

_____

[2] The certified record contains an envelope with the exhibits presented at Appellant's trial. The trial exhibits included two police reports, the "48" report and the "PARS" report, which the Commonwealth also submitted at the suppression hearing. The reports included for this Court's review did not even mention the condition of Appellant's eyes at the time of her arrest and nowhere described them as "normal."

the CCP properly reversed the Municipal Court's suppression ruling. *Id.* Thus, Appellant is not entitled to relief on her first issue.

In her second issue, Appellant asserts the Commonwealth did not timely pursue its motion for recusal of the Municipal Court jurist. Appellant contends the Commonwealth should have pursued recusal prior to the suppression hearing; instead, the Commonwealth did not act until after the original Municipal Court jurist had issued a ruling in favor of Appellant. Moreover, Appellant argues that the Commonwealth's recusal request lacked merit, because the connection between Appellant and the Municipal Court jurist was too attenuated. Appellant maintains the fact that she had a Facebook friendship with the jurist did not demonstrate the parties were anything more than acquaintances, and the Commonwealth fell short of establishing any type of bias. Appellant concludes the CCP erroneously ordered the Municipal Court jurist's recusal. We disagree.

We review recusal issues subject to the following principles:

> It is the burden of the party requesting recusal to produce evidence establishing bias, prejudice or unfairness which raises a substantial doubt as to the jurist's ability to preside impartially. As a general rule, a motion for recusal is initially directed to and decided by the jurist whose impartiality is being challenged. In considering a recusal request, the jurist must first make a conscientious determination of his or her ability to assess the case in an impartial manner, free of personal bias or interest in the outcome. The jurist must then consider whether his or her continued involvement in the case creates an appearance of impropriety and/or would tend to undermine public confidence in the judiciary. This is a personal and unreviewable decision that only the jurist can make.

- 18 -

> Where a jurist rules that he or she can hear and dispose of a case fairly and without prejudice, that decision will not be overturned on appeal but for an abuse of discretion. In reviewing a denial of a disqualification motion, we recognize that our judges are honorable, fair and competent.

*Commonwealth v. White*, 557 Pa. 408, 426, 734 A.2d 374, 383-84 (1999) (quoting *Commonwealth v. Abu-Jamal*, 553 Pa. 485, 507, 720 A.2d 79, 89 (1998)) (internal citations omitted). Additionally, "[A] party seeking recusal or disqualification must raise the objection at the earliest possible moment or that party will suffer the consequence of being time barred." *Commonwealth v. Pappas*, 845 A.2d 829, 846 (Pa.Super. 2004), *appeal denied*, 580 Pa. 712, 862 A.2d 1254 (2004) (quoting *Commonwealth v. Stafford*, 749 A.2d 489, 501 (Pa.Super. 2000)).

Instantly, the Commonwealth raised the recusal issue in its November 14, 2011 motion to reconsider the suppression ruling and new matter. In that motion, the Commonwealth referenced a newspaper article, dated November 5, 2011, detailing the outcome of the suppression hearing and the Facebook relationship between Appellant and the Municipal Court jurist. Under these circumstances, we decline Appellant's invitation to conclude that the Commonwealth should have filed a recusal motion prior to the suppression hearing. *See Pappas, supra*.

In seeking recusal, the Commonwealth noted: "A public visitor to [Appellant or the jurist's] Facebook page could readily view that each of them appears as a 'friend' on the other's page. Reports of their social

- 19 -

networking connection have been widely disseminated in the media." (**See** Motion to Reconsider and New Matter at 3) (internal citation omitted).  The record also includes the November 5, 2011 newspaper article that reported on the Facebook relationship in the wake of the court's decision to grant Appellant's suppression motion.  Significantly, the Commonwealth's filing demonstrated that the Municipal Court jurist's continued involvement in the case created an appearance of impropriety tending to undermine public confidence in the judiciary.  **See White, supra**.  Thus, the CCP did not err in removing the original jurist from the case in response to the Commonwealth's request.  **Id.**  Accordingly, we affirm the judgment of sentence.

Order affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/22/2014