J-S42024-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| THOMAS JOHN SCHRAM | : | |
| | : | |
| Appellant | : | No. 249 WDA 2022 |

Appeal from the Judgment of Sentence Entered February 14, 2022
In the Court of Common Pleas of Clearfield County Criminal Division at
No(s): CP-17-CR-0000529-2021

BEFORE: BOWES, J., OLSON, J., and COLINS, J.[*]

MEMORANDUM BY OLSON, J.: **FILED: JANUARY 11, 2023**

Appellant, Thomas John Schram, appeals from the February 14, 2022 judgment of sentence entered in the Court of Common Pleas of Clearfield County after the trial court, in a non-jury trial, convicted Appellant of, *inter alia*, driving under the influence ("DUI") of a drug or combination of drugs.[1] We affirm.

The trial court summarized the factual history as follows:

> The case at bar involved an incident in Clearfield County[, Pennsylvania,] on October 22, 2019. Just before [5:00 p.m.], Pennsylvania State Police [("PSP")] received a [911 emergency] call from a motorist about an erratic driver in a gray [vehicle]. Trooper Kacey Osborne was dispatched to [a convenience store]

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 75 Pa.C.S.A. § 3802(d)(2). Appellant was also found guilty of driving on roadways laned for traffic and careless driving. 75 Pa.C.S.A. §§ 3309(1) and 3714(a), respectively.

in Penfield, [Pennsylvania,] where the driver was reported to have stopped his vehicle. Upon her arrival, Trooper Osborne found the vehicle pulled into a parking spot, with the driver asleep in the driver's seat. Trooper Osborne was able to wake the driver after roughly thirty seconds of knocking on [the vehicle's] window. The driver was identified as [Appellant]. After speaking with [Appellant], Trooper Osborne suspected [Appellant] was under the influence [of drugs or alcohol and asked him to perform] field sobriety tests, to which [Appellant] agreed. Following the field sobriety tests, Trooper Osborne arrested [Appellant] for driving under the influence, and she transported [Appellant] to the hospital for a voluntary blood draw. The results of the blood tests showed clonazepam, carisoprodol, and buprenorphine in [Appellant's] blood.[2]

Trial Court Opinion, 4/11/22, at 1-2 (extraneous capitalization omitted).

On February 5, 2020, Appellant was charged with the aforementioned criminal offenses.[3] On November 3, 2021, at the conclusion of a non-jury trial, the trial court found Appellant guilty of the aforementioned criminal offenses. On February 14, 2022, the trial court sentenced Appellant to 72

---

[2] "Clonazepam is an intermediate to long-acting benzodiazepine hypnotic used in the treatment of insomnia and in the prevention and treatment of various seizure disorders." Commonwealth's Exhibit 5 at 3. "Carisoprodol is a centrally-acting skeletal muscle relaxant and sedative." *Id.* "Buprenorphine is a Schedule III controlled synthetic opioid that has both analgesic and opioid antagonist activities. . . . While buprenorphine can counteract some of the effects of powerful opiates[,] it also has opiate-like effects of its own[, including] analgesia, drowsiness, and sedation." *Id.* at 2.

[3] The criminal complaint also charged Appellant with DUI – of a Schedule II or Schedule III controlled substance, as defined by The Controlled Substance, Drug, Device, and Cosmetic Act, 35 P.S. § 780-101 to § 780-144, as well as DUI – of a metabolite of a Schedule II or Schedule III controlled substance. 75 Pa.C.S.A. § 3802(d)(1)(ii) and (iii). Prior to the start of Appellant's non-jury trial, the Commonwealth withdrew these two criminal charges.

hours to 6 months' incarceration for his DUI conviction. No further sentence was imposed for the two remaining criminal convictions. Appellant was ordered to pay fines and costs on all three criminal convictions. This appeal followed.[4]

Appellant raises the following issue for our review:

Did the Commonwealth fail to present sufficient evidence to establish the crime of driving under the influence of a drug or combination of drugs, in violation of 75 Pa.C.S.A. § 3802(d)(2), where the evidence failed to demonstrate a causal link between the prescription drugs detected in Appellant's blood and his purported inability to safely operate his vehicle?

Appellant's Brief at 4.

Our standard and scope of review of a challenge to the sufficiency of the evidence are well-settled.

The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proof or proving every element of the crime beyond a reasonable doubt by means of wholly

_____

[4] Both Appellant and the trial court complied with Pa.R.A.P. 1925. The Commonwealth filed a letter with this Court on October 24, 2022, stating that it concurred with the trial court's April 11, 2022 opinion and adopted the same *in lieu* of filing an appellee's brief.

circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all the evidence actually received must be considered. Finally, the trier[-]of[-]fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part[,] or none of the evidence.

***Commonwealth v. Pappas***, 845 A.2d 829, 835-836 (Pa. Super. 2004) (citation omitted), *appeal denied*, 862 A.2d 1254 (Pa. 2004); ***see also***

***Commonwealth v. Brown***, 52 A.3d 1139, 1163 (Pa. 2012) (stating that, in reviewing a claim of insufficient evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, **any** rational trier[-]of[-]fact could have found the essential elements of the crime beyond a reasonable doubt" (emphasis in original)).

[T]he [trier-of-fact's] individualized assessment of the credibility of the trial evidence is, as a general principle, not to be questioned by an appellate court as part of its review, even if the evidence is conflicting. [C]ourts presume the [trier-of-fact] resolved evidentiary disputes reasonably so long as sufficient evidence supports the verdict. [M]ere inconsistency and conflicts in witnesses['] testimony, by itself, will not furnish a basis for an appellate court to reverse a conviction [] on the grounds of evidentiary insufficiency.

***Brown***, 52 A.3d at 1165 (citations omitted). Rather, the trier-of-fact's resolution will only be disturbed "in those exceptional instances [] where the evidence is so patently unreliable that the [trier-of-fact] was forced to engage in surmise and conjecture in arriving at a verdict based upon that evidence."

***Id.***, *citing* ***Commonwealth v. Karkaria***, 625 A.2d 1167, 1170 (Pa. 1993).

To preserve a sufficiency claim, the appellant's Rule 1925(b) statement must

specify the element or elements upon which the evidence was insufficient.

*Commonwealth v. Williams*, 959 A.2d 1252, 1257 (Pa. Super. 2008).

Section 3802(d)(2) of the Vehicle Code states, in pertinent part, that,

An individual may not drive, operate[,] or be in actual physical control of the movement of a vehicle under any of the following circumstances:

. . .

(2) The individual is under the influence of a drug or combination of drugs to a degree which impairs the individual's ability to safely drive, operate[,] or be in actual physical control of the movement of the vehicle.

75 Pa.C.S.A. § 3802(d)(2). In order to convict a defendant of a Section 3802(d)(2) DUI offense, the Commonwealth must prove that "while driving or operating a vehicle, [the defendant] was under the influence of a drug to a degree that impaired [his or her] ability to safely drive or operate a vehicle." *Commonwealth v Griffith*, 32 A.3d 1231, 1236 (Pa. 2011) (original brackets omitted).

Our Supreme Court in *Griffith*, *supra*, held that,

[Section] 3802(d)(2) [does not require] expert testimony to establish that the defendant's inability to drive safely was caused by ingestion of a drug, even if it is a prescription drug, or drug combination. [Rather,] in some cases, depending on the specific facts and circumstances, expert testimony may be helpful, or perhaps even necessary, to prove causation under [Section] 3802(d)(2), but we decline to hold that the need for expert testimony is inherent in the statutory provision and thus mandatory in all cases.

*Id.* at 1238. "The need for expert testimony in a [Section] 3802(d)(2) prosecution must be evaluated on a case-by-case basis, taking into account

- 5 -

not just the specific drug at issue, prescription or otherwise, but also the nature and overall strength of the Commonwealth's evidence." ***Id.*** at 1239. "[E]xpert testimony is not necessary to establish impairment under [Section] 3802(d)(2) where there exists other independent evidence of impairment." ***Commonwealth v. Gause***, 164 A.3d 532, 538 (Pa. Super. 2017), *appeal denied*, 173 A.3d 267 (Pa. 2017).

Here, Appellant concedes "that he was operating a motor vehicle, that he was observed driving in an erratic manner, [and] that he had the reported quantities of prescription medications in his blood" on the day of the incident. Appellant's Brief at 11. Appellant contends, however, that the Commonwealth failed to present sufficient evidence of the causal connection between the prescription medications present in his blood and his erratic operation of a motor vehicle without the offer of expert testimony. ***Id.*** Appellant argues that an expert's testimony was necessary to sufficiently demonstrate that the erratic driving observed by the eyewitness who called 911 emergency services and the balance issues observed by Trooper Osbourne during field sobriety tests were caused by the prescription medication Appellant ingested earlier in the day. ***Id.*** at 13. Appellant asserts that, although the Commonwealth presented the testimony of an expert in forensic toxicology, "the Commonwealth still failed to present sufficient evidence to permit the [trier-]of[-]fact to infer a causal connection between the detected drugs and [Appellant's erratic driving]." ***Id.*** at 17.

In finding sufficient evidence to establish the causation element of the Section 3802(d)(2) offense, the trial court explained,

[t]o establish its case, the Commonwealth presented evidence from three witnesses. The first witness was [an eyewitness who] called 911 [emergency services] because of [Appellant's] erratic driving. During the trial, [the eyewitness] testified that he observed [Appellant's] vehicle swerving and weaving, to the point that [Appellant's] vehicle crossed the center line multiple times. [The eyewitness] also recalled that the vehicle would repeatedly speed up and slow down. At one point, [the eyewitness] observed [Appellant's] vehicle bump into a wall while he [] attempted to stop behind a school bus. While following [Appellant, the eyewitness] saw [Appellant] pull into the parking lot of [a convenience store. The eyewitness pulled his vehicle into the same parking lot and] remained in the parking lot until a [PSP] trooper arrived. At no time did [the eyewitness] see [Appellant] leave the parking lot. [The trial] court note[d] that [the eyewitness's] testimony was credible as to his recollection of the events that day. Additionally, the Commonwealth presented the recording of [the eyewitness's 911] call, which supported his testimony.

The second witness the Commonwealth presented was Trooper Osborne. When [Trooper Osborne] arrived to the [convenience store parking lot], she found [Appellant] asleep in the driver's seat of his vehicle. Trooper Osborne testified that it took roughly thirty seconds of knocking on the driver's [side] window to wake [Appellant]. While Trooper Osborne was talking with [Appellant], she noticed he looked disheveled, drowsy, and slightly confused. Further, [Appellant] admitted to Trooper Osborne that he had taken buprenorphine and carisoprodol earlier that day. Trooper Osborne then requested [Appellant] perform field sobriety tests, which [Appellant] agreed [to do].

During the field sobriety tests, Trooper Osborne detected multiple signs of impairment. [Appellant's] eyes appeared droopy and tired during the horizontal gaze nystagmus test. Trooper Osborne noticed [Appellant] had difficulty maintaining balance during her instructions for the walk-and-turn test. Additionally, [Appellant] missed multiple heel[-]to[-]toe steps and used his arms for balance. During the one-leg-stand [test, Appellant] dropped his leg several times, swayed, and raised his arms for balance. Lastly,

- 7 -

[Appellant] displayed eyelid and body tremors during the modified Romberg test[.[5] Appellant] also calculated 55 seconds to be [the equivalent of] 30 seconds. Following completion of the [field] sobriety tests, [Appellant] was arrested for driving under the influence, and he agreed to complete a blood draw.

The last witness the Commonwealth presented was Donna Papsun, a forensic toxicologist[. ]Papsun was found to be an expert in the field of forensic toxicology upon the agreement of [Appellant. ]Papsun completed the report for the results of [Appellant's] blood test. She testified that [Appellant's] blood was positive for clonazepam, carisoprodol, buprenorphine, and their metabolites, which are Schedule III and Schedule IV controlled substances. In her expert opinion, [] any of the three substances found in [Appellant's] blood could [impair] a person's ability to drive. The three substances in [Appellant's] system are depressants, and all three taken together "can have, this additive central nervous system depressant effect."

While [] Papsun agreed that the levels within [Appellant's] blood were within the therapeutic range, she also opined that it generally takes two weeks for a person to build up a tolerance to these types of substances. Until a person's body establishes a tolerance, they are likely to experience impairing effects from the drugs. [Appellant] presented copies of his prescription records. The records showed that he received [a] clonazepam [prescription] on October 8, 2019, [a] buprenorphine [prescription] on October 9, 2019, and [a] carisoprodol [prescription] on October 16, 2019. [Appellant] additionally testified that he had been incarcerated until October 8, 2019[,] and was not taking the medications during his incarceration. Based on [the] timeline presented, it is likely that [Appellant] was still building a tolerance to, at [a] minimum, the carisoprodol, but possibly all three substances.

_____

[5] The Romberg test is a field sobriety test in which the suspect puts his or her feet together so they are touching and puts his or her arms down along the side of the body and, when told to do so, tilts his or her head backward, shuts his or her eyes, and estimates the passage of 30 seconds in this position before ending the test. N.T., 9/24/21, at 32.

Trial Court Opinion, 4/11/22, at 4-6 (record citation and extraneous capitalization omitted).

A review of the record demonstrates that the eyewitness observed Appellant's vehicle swerving "quite a bit." N.T., 9/24/21, at 8. After observing Appellant's vehicle swerve into the on-coming lane of traffic, the eyewitness contacted 911 emergency services. *Id.* Appellant's vehicle was "constantly weaving," and "[t]here [were] a few times where [the eyewitness] was sure that [Appellant] was going to hit another vehicle." *Id.* at 9. At one point, while Appellant's vehicle was coming to a stop behind a school bus, the eyewitness observed Appellant's vehicle strike a retaining wall. *Id.* at 13-15. The eyewitness also testified that "[t]here [were] points where [Appellant] was driving fast and he would slow down and [then] he'd speed up and slow down." *Id.* at 16. The eyewitness followed Appellant's vehicle into a convenience store parking lot where Appellant parked his vehicle, and the eyewitness parked his own vehicle a short distance away. *Id.* at 11. The eyewitness maintained his observation of Appellant's vehicle until the police arrived. *Id.*

Trooper Osbourne testified that she was trained to determine if a suspect was under the influence of drugs or alcohol and to administer various field sobriety tests. *Id.* at 19. At the time of the incident, Trooper Osbourne was also certified in advanced roadside impairment driving enforcement. *Id.* at 20. In response to the 911 call, Trooper Osbourne located Appellant's vehicle in a convenience store parking lot, as reported by the eyewitness who

placed the emergency call. *Id.* at 21. Appellant's vehicle engine was still running, and Trooper Osbourne found Appellant "slumped over asleep in the driver's seat." *Id.* Trooper Osbourne was able to wake Appellant after knocking on the vehicle's driver's side window with her fist for 30 seconds. *Id.* at 22, 24. When Trooper Osbourne advised Appellant that she was responding to reports of Appellant's erratic driving, Appellant responded that "he was tired." *Id.* at 26. Appellant also admitted to taking several prescription drugs earlier that day. *Id.* Trooper Osbourne described Appellant as appearing dirty, disheveled, tired, drowsy, and "a little bit confused." *Id.* Trooper Osbourne, upon asking Appellant for identification, noted, however, that Appellant did not fumble or demonstrate any difficulty in producing his identification. *Id.* at 39. After Appellant agreed to perform several field sobriety tests, he exited his vehicle and walked towards Trooper Osbourne's police cruiser. *Id.* at 27. As Appellant was walking towards the police cruiser, Trooper Osbourne observed Appellant staggering. *Id.* at 40.

In performing the field sobriety tests, Appellant was unable to maintain his balance during the instruction phase of the walk-and-turn test, and while performing the test, Appellant missed multiple heel-to-toe steps and had to use his arms for balance. *Id.* at 30-31. During the one-leg stand test, Appellant dropped his leg 3 times, swayed, and used his arms for balance. *Id.* at 31. Finally, during the Romberg test, while Trooper Osbourne did not observe Appellant swaying, she did note that Appellant misjudged the 30 second length of time for performing the test and, instead, performed the test

for 55 seconds, which, in Trooper Osbourne's opinion, indicated Appellant's "internal clock [was] going slow." *Id.* at 32. In sum, as Trooper Osbourne explained, the field sobriety tests are not pass-or-fail tests, but, rather, allow a police officer to observe the suspect for "clues of impairment." *Id.* at 31. In Appellant's case, Trooper Osbourne observed several "clues of impairment" on each of the tests Appellant performed. *Id.* at 31-33.

Without knowing additional information, the Commonwealth's expert in forensic toxicology testified that she was unable to provide an opinion to a reasonable degree of scientific certainty as to whether the controlled substances detected in Appellant's blood on the day of the incident impaired his ability to operate his motor vehicle. *Id.* at 55. The expert explained that an impairment assessment, such as an assessment of Appellant's ability to operate his vehicle, requires knowledge of, *inter alia*, the person's history with the controlled substance, how long the person has been prescribed or using the controlled substance, and whether there has been any change in the use regimen or dosage. *Id.* at 57. The expert did opine, however, that, in general, a controlled substance, such as the controlled substances found in Appellant's blood, could have an impairing effect on a person when the person first starts using the controlled substance, and this impairment continues until the person develops a tolerance for the adverse effects of the controlled substance. *Id.* at 55, 59. A person develops a tolerance against the adverse effects of the controlled substance, the expert explained, generally after two weeks but that tolerance period can be prolonged if the person starts using

additional controlled substances or if there is a change in the dosage of the controlled substance. *Id.* at 60-61. When asked about the specific drugs detected in Appellant's blood, the expert stated that they were the "types of drugs that have central nervous system depressant effects." *Id.* at 55. In her toxicology report, the expert detailed that, based upon DUI related case studies involving each of these three drugs, all three of the drugs detected in Appellant's blood were found, in general, to have impaired a driver's ability to operate a motor vehicle. *See* Commonwealth's Exhibit 5 at 2-3.

Appellant testified that he was released from prison on October 7, 2019, and immediately began using buprenorphine. *Id.* at 66. Prior to his release from prison, Appellant was not using the three drugs that were detected in his blood on the day of the incident. *Id.* at 70. A report from Appellant's pharmacy confirms that Appellant filled prescriptions for, *inter alia*, buprenorphine on October 8, 2019, carisoprodol on October 16, 2019, and October 21, 2019, and clonazepam on October 8, 2019, and October 21, 2019. *See* Defendant's Exhibit B. As such, the incident occurred within two weeks of Appellant starting to use these three drugs.

Viewing the evidence in the light most favorable to the Commonwealth, as verdict winner, there is sufficient evidence to enable the trier-of-fact to find a causal connection between Appellant's use of the aforementioned drugs and his inability to safely operate his motor vehicle, even in the absence of expert testimony as to the issue of causation. It is uncontradicted that on the day of the incident, Appellant ingested, and had present in his blood, the three

aforementioned drugs.  Some time after Appellant ingested these drugs, an eyewitness observed Appellant operating his motor vehicle in an erratic and unsafe manner, and Appellant admitted to erratic operation of his motor vehicle.  Upon engaging Appellant, Trooper Osbourne observed ordinary signs that Appellant was under the influence of a drug or combination of drugs, including her finding Appellant "slumped over the steering wheel asleep" while his vehicle engine was running, and her observations of Appellant staggering while he walked and appearing drowsy with drooping eyes, as well as confused.  Moreover, based upon her training, Trooper Osbourne testified that Appellant exhibited multiple "clues of impairment" during the field sobriety tests, including his inability to main a one-leg stand, use of his arms for balance, and several missed steps in the heel-to-toe test.  Appellant's drowsiness, drooping eyes, and inability to perform the field sobriety tests properly, coupled with direct and undisputed observations of erratic driving, are ordinary signs of impairment discernable by laypersons.[6]  Expert testimony was, therefore, not required in the case *sub judice* to show a causal connection between Appellant's drug use and his impaired ability to safely

_____

[6] Unlike **Gause**, **supra**, where the Commonwealth's evidence of impairment was body and eye tremors, the evidence in the case *sub judice* involves widely understood *indicia* of impairment discernable by a layperson.  **See Gause**, 164 A.3d at 539 (stating, "staggering, stumbling, glassy or bloodshot eyes, and slurred speech" are "originally signs of [impairment] discernable by a layperson"); **see also Griffith**, 32 A.3d at 1240 (finding that, a person's unsteadiness and inability to perform field sobriety tests are widely understood *indicia* of impairment discernable by a layperson).

operate his motor vehicle.  Accordingly, Appellant's issue as it relates to the element of causation is without merit.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:  1/11/2023